# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-2505

_____

| | | |
|---|---|---|
| William E. Gagnon, Jr., | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the Western |
| Sprint Corporation, doing business | * | District of Missouri. |
| as Sprint Spectrum Finance | * | |
| Corporation, doing business as | * | |
| Sprint PCS, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: December 13, 2001

Filed: March 19, 2002 (Corrected 4/4/02)

_____

Before MORRIS SHEPPARD ARNOLD, BEAM, RILEY, Circuit Judges.

_____

BEAM, Circuit Judge.

William Gagnon brought this reverse race discrimination and retaliation case under Title VII, 42 U.S.C. § 2000e et seq., the Missouri Human Rights Act ("MHRA"), and the Uniformed Services Employment and Reemployment Rights Act ("USERRA"). Gagnon appeals the district court's issuance of judgment as a matter of law ("JAML") at the close of plaintiff's case in favor of Sprint PCS on his discrimination and retaliation claims under Title VII and the MHRA. Gagnon also

appeals the district court's grant of summary judgment in favor of Sprint PCS on his USERRA discrimination and retaliation claims[1]. Upon a de novo review of the record, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I.    BACKGROUND

On January 31, 1997, Gagnon retired from the United States Army as a Lieutenant Colonel after serving more than twenty-one years. Gagnon then worked at Cubic Applications, Inc. ("Cubic"), a defense contractor. He was in Cubic's employ for three months prior to becoming associated with Sprint PCS.

Gagnon began working for Sprint PCS in March 1997. Sprint PCS hired Gagnon as a curriculum developer in its training department ("TAPS") at a starting salary of $44,100 with a short-term incentive potential ("STI") of $3,000. Gagnon was directly supervised by Kathleen Wilder, the director of the department, from his initial starting date in March until his promotion. Gagnon was promoted in October 1997 to CBT-Manager, a new management position in the department. At the time of Gagnon's promotion, Wilder was out of the office on maternity leave and Jim Keenan, the department manager, and Lynn Meredith-Ball, another manager in Wilder's department, assumed Wilder's responsibilities as director of the training group. In Wilder's absence, Vice-President Jim Mendenhall was instrumental in promoting Gagnon to the manager position.

---

[1]We also note that there are two pending motions taken with the case. Appellant's Motion for Judicial Reassignment is denied. We do not question Judge Whipple's impartiality in this matter and find nothing in the record to otherwise suggest that he conducted the proceedings unfairly. Appellant's Motion for Waiver of Costs is granted pursuant to 38 U.S.C. § 4323(h).

Because Gagnon's position was new at Sprint PCS, it did not have a dollar figure assigned for compensation. Therefore, Gagnon submitted a job description for the position, with the assistance of Meredith-Ball, to the Human Resources Department ("HR") so that a compensation amount could be assigned. The Sprint PCS compensation group within HR established a market reference point ("MRP") of $66,000 with a STI of $9,500. The MRP is not a guaranteed salary point, but rather a targeted reference point for a tenured employee in that position.

As a matter of procedure at Sprint PCS, when a salary increase greater than ten percent is sought, a Compensation Exception Request form stating the amount of the raise requested is completed, sent to HR for a recommendation, then forwarded to a vice president in charge of the department for a recommendation. Then, finally the appropriate chief officer or his designee reviews all recommendations and makes final decisions on salary increases. In conjunction with Gagnon's promotion, Meredith-Ball prepared a Compensation Request Form to raise Gagnon's salary from $44,100 to $66,000, reflecting the full MRP established by the compensation group. HR did not support Meredith-Ball's proposed raise to the full $66,000 but instead proposed a salary at eighty-five percent of MRP, the equivalent of a twenty-five percent raise for Gagnon. Meredith-Ball and Julie Moylan, the HR Compensation Manager, signed the proposed compensation form on October 1, 1997. At that time, the form reflected Meredith-Ball's request for a base salary increase to $66,000 and Moylan's recommended twenty-five percent increase. Meredith-Ball submitted the request with both proposals to Vice-President Mendenhall for his approval. Mendenhall rejected both proposals on the compensation exception request form.

Mendenhall's rejection of the initial compensation request is an important part of Gagnon's claim of discrimination. According to trial testimony, Mendenhall looked at the document with the attachments and threw it back across his desk at Meredith-Ball stating, "I'm not going to pay him that, he's a white guy, isn't he?" Mendenhall further allegedly stated, "If he were a woman or a minority, I would have

to pay him, but I don't have to pay him." Meredith-Ball recalls Mendenhall refusing to discuss his stated position and clearly stating, "I'm not going to pay him. He's just a white guy." Mendenhall also stated, "That's absurd. Nobody gets more than ten percent."

After failing to obtain approval of either the full $66,000 salary for Gagnon or the proposed twenty-five percent increase recommended by Moylan, Meredith-Ball revised the compensation form to request an eleven percent raise followed by an automatic ten percent raise in six months. HR approved the eleven percent raise but did not endorse the automatic ten percent raise in six months, suggesting that Gagnon seek a ten percent raise in six months, dependent on his performance. Meredith-Ball took the revised compensation request form to Mendenhall who approved Meredith-Ball's recommendation in its entirety, including the automatic raise in six months. The form was then presented to Al Kurtze, the chief operating officer. Kurtze had the final vote on this compensation decision. Kurtze agreed with HR's recommendation and approved only the immediate eleven percent raise, with the suggestion that the automatic increase in six months be processed with separate approval action.

Gagnon filed a claim with the Equal Employment Opportunity Commission ("EEOC") in April 1998 because he was dissatisfied with his compensation increases. Gagnon claims his workplace environment deteriorated after he filed his EEOC claim and it became difficult for him to timely complete work tasks because Wilder stopped seeking his advice and stopped discussing department issues with him.

In August 1998, Gagnon and Meredith-Ball organized a discussion with four other Sprint PCS employees outside the training department building. Gagnon and Meredith-Ball informed the group of employees, all of whom possessed prior military experience, of Sprint PCS's growth outside Wilder's department. During that discussion, various statements indicated (although all parties are not in agreement) that Gagnon and Meredith-Ball advised the four employees that Wilder was uncomfortable

-4-

with the number of employees in her department with prior military experience and, therefore, would not promote anyone with such a background. However, the record also reflects that during a managers' meeting two months prior, Wilder stated there was a perception among some employees in the department that employees *had* to be retired military to advance. Gagnon responded at the managers' meeting that the perception was not true. Wilder also admitted at this managers' meeting that she was uncomfortable that some of her employees thought they were being treated differently because they were *not* military. Wilder later told Gagnon she was uneasy with the number of military employees in the department.

As a result of the alleged statements made during the meeting outside the training department regarding Wilder's comfort, or lack thereof, Gagnon and Meredith-Ball were placed on written reminder, a form of reprimand. This written reminder prohibited Gagnon and Meredith-Ball from seeking a promotion or transfer without a vice president's approval for a period of six months. Gagnon claims the written reminder, in addition to Wilder's failure to give him a promised ten percent raise in July, and the continued isolation of Gagnon in his department constituted retaliation.

Gagnon subsequently filed this lawsuit charging Sprint PCS with violating USERRA for setting his initial salary $1,000 lower due to his lack of corporate experience and for disciplining him following the meeting outside the Sprint PCS training department building. Gagnon also charged Sprint PCS with violating Title VII and the MHRA for denying his salary raise upon receiving the promotion to CBT Manager.

## II.    DISCUSSION

The grant of a judgment as a matter of law is reviewed de novo, applying the same standards used by the district court. Fogelbach v. Wal-Mart Stores, Inc., 270

-5-

F.3d 696, 700 (8th Cir. 2001). Pursuant to Rule 50, judgment as a matter of law should only be granted when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue. Fed. R. Civ. P. 50(a)(1). "In making this determination, the court must draw all reasonable inferences in favor of the nonmoving party without making credibility assessments or weighing the evidence." Phillips v. Collings, 256 F.3d 843, 847 (8th Cir. 2001).

### A. Discrimination Claim

Plaintiffs like Gagnon pursuing claims of discrimination under Title VII have two models under which they may proceed. First, a plaintiff can proceed under the three-stage, burden-shifting standard set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this standard, Gagnon must first establish a prima facie case of discrimination. Once the prima facie case is established, the burden shifts to Sprint PCS to articulate a non-discriminatory reason for the adverse employment action. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993). If Sprint PCS articulates such a reason, Gagnon must respond with sufficient evidence that the proffered reason was really a pretext for intentional discrimination. Id. At all times under this model, the burden of persuasion remains on Gagnon, the plaintiff. Id.

Alternatively, Gagnon can proceed under the mixed-motive standard set forth in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), if he is able to produce "direct evidence that an illegitimate criterion . . . 'played a motivating part in [the] employment decision.'" Cronquist v. City of Minneapolis, 237 F.3d 920, 924 (8th Cir. 2001) (alterations in original) (quoting Price Waterhouse, 490 U.S. at 258). Once Gagnon establishes such direct evidence, the burden shifts to Sprint PCS to demonstrate by a preponderance of the evidence that it would have reached the same employment decision absent any discrimination. Cronquist, 237 F.3d at 924. As modified by section 107 of the Civil Rights Act of 1991, 42 U.S.C. § 2000e-5(g)(2),

the mixed-motive model allows for declaratory relief, injunctive relief, attorney's fees and costs once Gagnon meets his initial burden regarding direct evidence. 42 U.S.C. § 2000e-5(g)(2)(B)(i). Thus, Sprint PCS is liable for discrimination under this model upon direct evidence that it acted on the basis of a discriminatory motive. Breeding v. Gallagher and Co., 164 F.3d 1151, 1156 (8th Cir. 1999). Whether or not Sprint PCS satisfies its burden to show by a preponderance that it would have reached the same employment decision absent any discrimination is only relevant to determine whether the court may award full relief including damages, court ordered admissions, reinstatement, hiring, promotion or other such relief. Id.; 42 U.S.C. § 2000e-5(g)(2)(A) & (B)(ii). We apply this analysis to Gagnon's MHRA discrimination claim as well as his Title VII claim. Dorsey v. Pinnacle Automation Co., 278 F.3d 830, 836 (8th Cir. 2002).

Because this is a claim of reverse race discrimination, Gagnon additionally must show "that background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority." Duffy v. Wolle, 123 F. 3d 1026, 1036 (8th Cir. 1997) (quoting Murray v. Thistledown Racing Club, Inc., 770 F.2d 63, 67 (6th Cir. 1985)). However, if Gagnon fails to make this showing, he may still proceed by adducing sufficient evidence of intentional discrimination against *him*, in order to proceed beyond the prima facie case stage of litigation. Id. In other words, he is clearly able to proceed in a reverse discrimination claim if there is direct evidence of discrimination.

Gagnon first argues that judgment as a matter of law was improper because Mendenhall's statement "I'm not going to pay him. He's just a white guy," is direct evidence of unlawful reverse discrimination. See Price Waterhouse, 490 U.S. at 270-73. The district court held that JAML was appropriate because Kurtze was the decision-maker, not Mendenhall, and there was no evidence that Kurtze knew of Mendenhall's comment or acted on it.

Direct evidence is evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude in such a way that the fact finder could infer that the attitude was more likely than not a motivating factor in the employer's decision. Walton v. McDonnell Douglas Corp., 167 F.3d 423, 426 (8th Cir. 1999). However,

> Not all comments that may reflect a discriminatory attitude are sufficiently related to the adverse employment action in question to support such an inference. For example, stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself will not suffice.

Id. (internal quotations omitted).

Courts look beyond the moment a decision was made in order to determine whether statements or comments made by other managerial employees played a role in the ultimate decisionmaking process. "An employer cannot escape responsibility for willful discrimination by multiple layers of paper review, when the facts on which the reviewers rely have been filtered by a manager determined to purge the labor force of [protected] workers." Gusman v. Unisys Corp., 986 F.2d 1146, 1147 (7th Cir. 1993).

While Kurtze's decision may have ultimately been free of any discriminatory animus, we cannot sterilize a seemingly objective decision when earlier discriminatory decisions lead to the adverse employment action. See Webb v. St. Louis Post-Dispatch, 51 F.3d 147, 149 (8th Cir. 1995) (finding that the employer's failure to accommodate the plaintiff's nervous condition possibly constituted discriminatory treatment even though Post's ultimate decision to terminate Webb was based upon his unexcused absenteeism); Stacks v. Southwestern Bell Yellow Pages, Inc., 27 F.3d 1316, 1318, 1324-25 (8th Cir. 1994) (finding a supervisor's comment that "women . . . were the worst thing" that had happened to the company to be direct evidence of

discrimination supporting an inference that an illegitimate criterion was a motivating factor in an employment decision, even though the division manager made the ultimate decision to terminate the plaintiff); Kientzy v. McDonnell Douglas Corp., 990 F. 2d 1051, 1057-58 (8th Cir. 1993) (looking beyond the moment the decision to fire the plaintiff was made, which was free from discrimination, because the plaintiff's supervisor had treated her differently than her male counterparts).

The district court stated that the evidence introduced at trial revealed that Kurtze, not Mendenhall, was the decisionmaker for Gagnon's October 1997 raise and potential fifty percent increase. We fail to find any evidence of this in the record. According to the trial testimony, Meredith-Ball submitted the proposal for the full base salary increase to $66,000 to Mendenhall and he rejected the proposal because Gagnon was "only a white guy." After this rejection, the proposal was amended to reflect an eleven percent increase followed by an automatic ten percent increase in six months. This second proposal was the only compensation increase put before Kurtze. Gagnon alleges discrimination based upon the fact that Mendenhall rejected the initial base increase proposal submitted by Meredith-Ball. That initial proposal was never before Kurtze because of Mendenhall's blanket rejection and alleged discriminatory comments. Thus, Mendenhall *was* the final decisionmaker as to the initial decision to deny Gagnon a base increase from $44,100 to $66,000 in October 1997.

Without judging the credibility of these witnesses, we believe there is sufficient evidence to place before a jury Sprint PCS's reasons for rejecting Gagnon's initial salary increase in October 1997. Since there exists direct evidence of discrimination, Sprint PCS bears the burden of showing that it would have reached the same employment decision absent any discrimination. Price Waterhouse, 490 U.S. at 258. In other words, Sprint PCS must show the proffered raise from $44,100 to $66,000 would have been reduced to an eleven percent increase absent Mendenhall's discriminatory remarks. This determination must be made by the finder of fact, and therefore judgment as a matter of law was inappropriate.

**B. Retaliation Claim**

Gagnon claims Sprint PCS unlawfully retaliated against him after his EEOC claim in April 1998 by issuing a reprimand in the form of a written reminder and by failing to approve additional compensation increases as Wilder had allegedly promised. Gagnon claims this constituted a hostile work environment and affected Gagnon's future career prospects at Sprint PCS. "Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3, makes it unlawful for an employer to discriminate against an employee, for among other things, 'because [s]he has opposed any practice made an unlawful employment practice by this subchapter.'" Buettner v. Arch Coal Sales Co., 216 F.3d 707, 713 (8th Cir. 2000) (alteration in original) (quoting 42 U.S.C. § 2000e-3). Absent direct evidence of discrimination invoking the mixed-motive analysis of Price Waterhouse, the burden-shifting analysis of McDonnell Douglas applies to claims of retaliation. Buettner, 216 F.3d at 713.

> To establish a prima facie case of retaliatory discrimination, a plaintiff must show: (1) [he] engaged in activity protected by Title VII; (2) an adverse employment action occurred; and (3) a causal connection existed between participation in the protected activity and the adverse employment action.

Id. at 713-14 (citations omitted). Effectively, the same standards apply to Gagnon's MHRA retaliation claims.[2] Id. at 714.

_____

[2]We recognize that Missouri Revised Statute § 213.070(2) prohibits retaliation "in *any* manner against *any* person" and that this language is broader than that found under Title VII, section 2000e-3. Mo. Rev. Stat. § 213.070(2) (emphasis added). See Keeney v. Hereford Concrete Prods., Inc., 911 S.W.2d 622, 625-26 (Mo. 1995). However, we do not reach the outer boundaries of section 213.070 in this matter as Gagnon is a person who falls within both provisions, as does the alleged manner of retaliation. Thus, we reach the same conclusion under both Title VII and the MHRA in this case.

Gagnon introduced evidence at trial regarding his account of the poor treatment he received from Wilder and others in his department after he filed a charge with the EEOC. He also received a written reminder on August 27, 1998, which Gagnon claims further evidences the hostile environment because it was issued one month after Sprint PCS filed its response to his EEOC claim. The district court held that Gagnon failed to establish that either of these actions rose to the level of actionable retaliation under controlling Eighth Circuit authority.

"An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage." Spears v. Missouri Dep't of Corr. and Human Res., 210 F.3d 850, 853 (8th Cir. 2000) (citation omitted). "Termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects meet this standard . . .." Id. (citation omitted).

It is well-settled in this circuit that ostracism and rudeness by supervisors and co-workers do not rise to the level of an adverse employment action. Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 969 (8th Cir. 1999) (finding general allegations of co-worker ostracism are not sufficient to rise to the level of an adverse employment action); Manning v. Metropolitan Life Ins. Co., 127 F.3d 686, 693 (8th Cir. 1997) (holding that disrespect and ostracism did not rise to the level of actionable adverse employment action because there was no tangible change in duties or working conditions). Gagnon failed to establish that the alleged ostracism by Wilder and co-workers rose to the level of actionable retaliation. Gagnon's testimony reflects that Wilder ignored him and that it became difficult for him to function as a member of her team, but provides no evidence that this behavior had any impact on his job title, salary, benefits, or any other material aspect of his employment. See Spears, 210 F.3d at 854 (finding the plaintiff's transfer to a new location merely an inconvenience and not actionable under Title VII because there was no evidence that her transfer had any

-11-

impact on her job title, salary, benefits, or any other material aspect of her employment).[3]

Gagnon further alleges the August 1998 written reminder significantly affected his future career prospects because it limited his ability to seek promotions or transfers. In fact, Gagnon alleges that as a result of the written reminder, his future career prospects were eliminated altogether. We question whether the effect of the written reminder constitutes an adverse employment action but note that even unfavorable evaluations might be actionable if the employer subsequently uses them as a basis to detrimentally alter the terms or conditions of employment. Id. "Papering" an employee's file with negative reports and reprimands may sufficiently support a claim of retaliation if they adversely affect or undermine an employee's position. Kim v. Nash Finch Co., 123 F.3d 1046, 1060 (8th Cir. 1997).

In granting JAML to Sprint PCS on this issue, the district court relied on our decision in Flannery v. Trans World Airlines, Inc., 160 F.3d 425 (8th Cir. 1998). The district court cited Flannery for the proposition that "an admonishment to an employee is not actionable retaliation." Our holding in Flannery was not so broad. We determined in Flannery that admonishment and removal of complimentary letters from an employee's personnel file did not constitute an adverse employment action in that case because the employee failed to allege that these actions resulted in reduced salary, benefits, seniority, or responsibilities, or any other materially significant disadvantage. Id. at 428. Gagnon, on the other hand, alleges that the written reminder resulted in the

_____

[3]We again note that Gagnon failed to establish that the alleged ostracism by Wilder and co-workers rose to the level of actionable retaliation under the MHRA because he failed to provide sufficient evidence as a matter of law that "as a direct result [of protected activity], he . . . suffer[ed] any damages due to [this] act of reprisal." Keeney, 9ll S.W.2d at 625; Buettner, 216 F.3d at 715 n.8; Cross v. Cleaver, 142 F.3d 1059, 1076 (8th Cir. 1998).

outright closing of job openings to him and the loss of opportunity to compete for any position, which, if true, might support a claim of retaliation.

Our final inquiry on Gagnon's claim of retaliation is whether he has raised sufficient evidence as a matter of law connecting the adverse employment action to his EEOC claim. The written reminder was issued after Sprint PCS investigated the circumstances surrounding the meeting outside of the department held by Gagnon and Meredith-Ball. On its face, the written reminder clearly sets forth the reasons for its issuance–because Gagnon, as a member of the management team, created a false perception of discrimination and Sprint PCS was concerned with his level of professionalism, personal effectiveness and team conduct. Gagnon places great emphasis on the fact that the written reminder was issued one month after Sprint PCS filed its response to his EEOC claim. But, "[g]enerally, more than a temporal connection . . . is required to present a genuine factual issue on retaliation." Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999). Thus we look to Gagnon's remaining evidence to determine whether he has satisfied his burden as a matter of law.

We find as a matter of law that Gagnon fails to prove any causal connection between his EEOC claim of discrimination and the issuance of the written reminder. Even though Gagnon did not violate a company policy when he gathered with his fellow employees outside of the building, Sprint PCS certainly had the authority to issue a reminder regarding the effect of that meeting, given the fact that Gagnon was in a management position. Sprint PCS clearly set forth its reason for the issuance of the reminder and identified several personal traits of Gagnon needing improvement. Contrary to Gagnon's argument, the fact that Wilder made a comment regarding her level of comfort with military employees in her department is not dispositive, as it was made to colleagues at a managers' meeting, and furthermore does not connect the issuance of the written reminder with the filing of Gagnon's EEOC claim.

-13-

Gagnon further claims Wilder had no factual basis for stating in the written reminder that Gagnon created the false perception of discrimination. But Gagnon himself testified that he had a discussion with Wilder and Kim Klosak during their investigation of the matter which suggests that Wilder did make factual findings regarding the meeting held by Gagnon and Meredith-Ball. Finally, Gagnon claims that Wilder's failure to secure a promised raise for Gagnon evidences her retaliatory motive. Again, the evidence doesn't create such an inference. Gagnon testified that Wilder did attempt to increase his compensation in January 1998, he received a small merit increase in April 1998, and he was aware that there were "no guarantees" in Wilder's efforts to secure a raise. Although Gagnon did not receive his allegedly promised July increase, the only connection he makes supporting an inference of retaliation at that point is the timing in connection with his EEOC claim, and that is not enough as a matter of law.

We find the record empty of any evidence connecting Gagnon's EEOC claim filed in April 1998 and the issuance of the written reminder in August 1998. Thus, JAML was appropriate and the opinion of the district court is affirmed on this point. See Kipp v. Missouri Highway Transp. Comm'n, Nos. 01-1814/1922, slip op. (8th Cir. Feb. 20, 2002) (granting JAML because the plaintiff failed to establish the causal link necessary to make out a prima facie case of retaliation).

## C.    USERRA Discrimination Claim

In reviewing a grant of summary judgment, we review the decision of the district court de novo. Buettner, 216 F.3d at 713. The question before us on appeal is whether the record, when viewed in the light most favorable to the non-moving party, shows there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Id.

The USERRA, enacted in 1994 to improve the Veterans' Reemployment Rights Act ("VRRA"), prohibits employment discrimination on the basis of military service. Hill v. Michelin N. Am., Inc., 252 F.3d 307, 311 (4th Cir. 2001); 38 U.S.C. § 4311 et. seq. Section 4311(a) provides:

> A person who is a member of . . . [or] has performed . . . in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership . . ..

The USERRA replaced the "sole cause" standard of the VRRA, which "protect[ed] the employee-reservist against discriminations like discharge and demotion, motivated *solely* by reserve status." Knowles v. Citicorp Mortgage, Inc., 142 F.3d 1082, 1085 n.3 (8th Cir. 1998) (emphasis in original) (citation omitted); Newport v. Ford Motor Co., 91 F.3d 1164, 1167 (8th Cir. 1996). Under the USERRA, an employer violates the act when a person's membership in the uniformed services is a *motivating factor* in the employer's action, "unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service." 38 U.S.C. § 4311(c)(1).

In Gagnon's claim of discrimination under the USERRA, he asserts that because of his military background, he received a lower starting salary. The district court held that because Sprint PCS provided evidence of a factor other than Gagnon's military service to explain the disparity in his initial pay, Sprint PCS's motion for summary judgment was warranted. However, our inquiry does not carry us that far into the analysis. We find Gagnon fails to state a claim of discrimination under the USERRA. Gagnon has not been denied "initial employment, reemployment, retention in employment [or] promotion," as covered under section 4311(a). Thus, his only basis

-15-

for a claim of discrimination under section 4311(a) is that Sprint PCS denied him a benefit of employment due to his prior service membership. Gagnon claims he was paid $1,000 less than his peers at Sprint PCS. The term "benefit," as defined by the USERRA, specifically excludes wages or salary for work performed. 38 U.S.C. § 4303(2). Thus, Gagnon has no basis for maintaining his claim of discrimination under the USERRA.

### D.    USERRA Retaliation Claim

Gagnon also alleged retaliation under the USERRA based upon Sprint PCS's actions following Gagnon's internal complaints of activity he perceived as illegal USERRA discrimination. The district court held that the USERRA only applies to a retaliation claim if the employee has taken a *formal* enforcement action as provided in section 4323. Thus, the court held that Gagnon was unable to maintain a cause of action for retaliation under the USERRA because he did not file a complaint with the secretary of labor nor commence a civil action against Sprint PCS. We disagree with this initial conclusion. Under a plain reading of the statute, we hold that Gagnon's internal complaints suffice as protected activity under the USERRA.

The USERRA standard for retaliation claims is set forth in 38 U.S.C. §§ 4311(b) and 4311(c)(2):

> (b) An employer may not discriminate in employment against or take any adverse employment action against any person because such person (1) has taken an action to enforce a protection afforded any person under this chapter, . . .

> (c) An employer shall be considered to have engaged in actions prohibited–(2) under subsection (b), if the person's (A) action to enforce a protection afforded any person under this chapter, . . . or (D) exercise of a right provided for in this chapter, is a motivating factor in the

employer's action, unless the employer can prove that the action would have been taken in the absence of such person's enforcement action, . . . or exercise of a right.

Gagnon correctly asserts on appeal that the appropriate standard of proof in a discrimination or retaliation claim under the USERRA is the so-called "but for" test and that the burden of proof is on the employer, once the employee's case is established. Sheehan v. Dep't of Navy, 240 F.3d 1009, 1013 (Fed. Cir. 2001). The legislative history and treatment by other circuits support this evidentiary scheme, set forth below, for USERRA cases. See NLRB. v. Transportation Mgmt. Corp., 462 U.S. 393, 401 (1983) (modified by Director, Office of Workers' Compensation Programs v. Greenwich Collieries, 512 U.S. 267 (1994)). We apply this precedent:

> The procedures established by precedent require an employee making a USERRA claim of discrimination to bear the initial burden of showing by a preponderance of the evidence that the employee's military service was "a substantial or motivating factor" in the adverse employment action. If this requirement is met, the employer then has the opportunity to come forward with evidence to show, by a preponderance of the evidence, that the employer would have taken the adverse action anyway, for a valid reason.

Sheehan, 240 F.3d at 1013 (citations omitted).

Unlike the McDonnell Douglas framework adopted by the district court in this matter, the procedural framework and evidentiary burdens set out in section 4311 shift the burden of persuasion, as well as production, to the employer. "Thus in USERRA actions there must be an initial showing by the employee that military status was at least a motivating or substantial factor in the [employer's] action, upon which the [employer] must prove, by a preponderance of evidence, that the action would have been taken despite the protected status." Sheehan, 240 F.3d at 1014.

One question before us is whether Gagnon's internal complaints constitute an "action to enforce a protection afforded any person" under the USERRA. Under both USERRA and Title VII, a plaintiff must first assert that she engaged in some form of protected activity in order to determine whether the employer retaliated against the employee. However, the district court mistakenly held that the first Title VII inquiry is whether a charge of harassment was filed.[4] The court then went on to hold that although Title VII also protects actions in opposition to perceived conduct prohibited by Title VII, the USERRA protects only formal enforcement of rights in its prohibition of retaliatory conduct. It is clear, though, that like Title VII, many actions may form the basis of protected activities giving rise to a claim of retaliation under the USERRA. Under section 4322(a)(2)(A), the USERRA anticipates that people may take alternate steps or "actions" to seek enforcement of the USERRA, prior to filing a formal complaint with the secretary of labor or filing a civil action.[5] Various

---

[4]The elements of a claim of retaliation in violation of Title VII are the following: (1) the plaintiff filed a charge of harassment *or engaged in other protected activity*; (2) the plaintiff's employer subsequently took adverse employment action against the plaintiff; and (3) the adverse action was causally linked to the plaintiff's protected activity. Scusa, 181 F.3d at 968; Cross v. Cleaver II, 142 F.3d 1059, 1071 (8th Cir. 1998). "Protected activities" under Title VII include much more than merely filing a formal charge of harassment. Fierros v. Texas Dep't of Health, 274 F.3d 187, 194 (5th Cir. 2001) (recognizing that internal discrimination complaints and use of employer's internal administrative processes are clearly protected activities for purposes of a Title VII retaliation claim); Raniola v. Bratton, 243 F.3d 610, 624 (2d Cir. 2001) (finding internal complaint to be a qualified activity protected from retaliation by Title VII and citing authority noting that "Congress sought to protect a wide range of activity in addition to the filing of a formal complaint") (citation omitted); O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1255 (10th Cir. 2001) (finding informal complaints to superiors constitute protected activity under Title VII).

[5]"A person who claims that such person is entitled under this chapter to employment or reemployment rights or benefits with respect to employment by an employer; and such employer has failed or refused, or is about to fail or refuse, to

informal activities could occur in order for an employee to determine that their employer has not complied with or will not comply with the USERRA. The formal procedures of enforcement are merely another alternative under the USERRA once an employee makes this determination.

We find further support for the proposition that an "action to enforce a protection afforded any person" under the USERRA subsumes more than just formal complaints filed with the secretary of labor or civil actions in <u>Brandsasse v. City of Suffolk, Virginia</u>, 72 F. Supp. 2d 608, 619 (E.D. Va. 1999). In <u>Brandsasse</u>, the plaintiff was a city police officer who was refused consideration for a promotion allegedly because of discrimination he incurred as a result of his Army Reserve obligations. <u>Id.</u> at 611-12. The court concluded that sufficient allegations were made by the plaintiff to support a cause of action for retaliation. <u>Id.</u> at 619.

The basis of the plaintiff's claim in <u>Brandsasse</u> was that he took steps to enforce his rights under the statute by speaking with the director of personnel, and hired counsel to pursue his claims under the USERRA. The defendants subsequently began a retaliatory investigation. <u>Id.</u> at 612, 619. The district court in <u>Brandsasse</u> did not dismiss the claim because the plaintiff had not *formally* filed a claim with the secretary of labor nor filed a civil action against the defendants. In fact, the court concluded that raising internal complaints and seeking the advice of outside counsel "seems to be exactly the sort of adverse employment action which the statute contemplates." <u>Id.</u> at 620.

We agree with the assessment in <u>Brandsasse</u> and find that Gagnon, too, engaged in just the sort of conduct which the statute contemplates. We also previously

---

comply with the provisions of this chapter, . . . may file a complaint with the Secretary in accordance with subsection (b), and the Secretary shall investigate such complaint." 38 U.S.C. § 4322(a)(1) & (2)(A).

established that a written reminder may constitute an adverse employment action. Thus, Gagnon's final burden was to establish that his military status was at least a motivating or substantial factor in Sprint PCS's issuance of the written reminder. Sheehan, 240 F.3d at 1014. This is where Gagnon falls short. Gagnon does not refer us to any causal evidence supporting his claim of retaliation under the USERRA. Our review of the record suggests that there is no evidence connecting Gagnon's internal complaints of discrimination and the issuance of the written reminder following the meeting held outside of the department by Gagnon and Meredith-Ball. Because Gagnon is unable to meet his burden as a matter of law to establish a prima facie case of retaliation under the USERRA, the district court grant of summary judgment is affirmed.

### E.     Evidentiary & Discovery Issues

Gagnon finally urges us to instruct the district court to vacate its ruling denying admission into evidence Plaintiff's Exhibit 306 containing salary information of Sprint PCS employee Frank Gardi. Gagnon also requests that the district court on remand (1) vacate its rulings on Gagnon's motion to compel regarding the attorney-client and work-product privileges asserted by Sprint PCS due to the involvement of its in-house counsel Martin; (2) vacate the protective order entered over the deposition of Paul Bass; (3) vacate its ruling denying admission into evidence of Plaintiff's Trial Exhibits 37, 38, 39, 252, and 294 involving communications with Martin.

A district court's refusal to compel discovery is reversed upon a showing of gross abuse of discretion. Wilson v. Int'l Bus. Machs. Corp., 62 F.3d 237, 240 (8th Cir. 1995). We find no abuse of the court's discretion concerning the motion to compel the documents protected by the work-product privileges asserted by Sprint PCS. The district court conducted an *in camera* review of specific documents and

twice entertained substantial briefing by both parties. Even though Gagnon argues that these documents are not subject to the work-product privilege because they were created in the ordinary course of Sprint PCS's business, the district court found they were prepared in anticipation of litigation and therefore protected from discovery. The district court's holding, based upon a careful review of the documents, as well as both parties' briefing on the matter, is not a gross abuse of discretion, and we therefore affirm.

Gagnon also challenges the protective order issued by the district court concerning the deposition of Paul Bass. Paul Bass was one of the individuals involved in the internal investigation of Gagnon's claim of retaliation. The district court granted Sprint PCS's protective order, holding that the investigation by Bass, at the direction of Martin, was in anticipation of litigation and is covered by the attorney work-product privilege. Gagnon, citing Upjohn Co. v. United States, 449 U.S. 383, 395 (1981), argues that the attorney-client privilege only protects disclosure from communications, not disclosures of the underlying facts by those who communicated with the attorney. Gagnon claims Bass is a fact witness and not Sprint PCS's corporate representative, thus he is outside the scope of the attorney-client privilege. The district court, however, did not abuse its discretion in making a contrary finding, noting that the investigation conducted by Bass was an integral part of in-house counsel Martin's investigation. We affirm.

Finally, Gagnon challenges several evidentiary rulings made by the district court at trial. We review a trial court's evidentiary rulings under the abuse of discretion standard, according the district court substantial deference. Shelton v. Consumer Prods. Safety Comm'n, 277 F.3d 998, 1009 (8th Cir. 2002).

At trial, Gagnon sought to introduce five documents reflecting e-mails and letters between Sprint PCS's in-house counsel, Gagnon and Meredith-Ball concerning Gagnon's complaint of retaliation. Gagnon mistakenly argues on appeal that the district court excluded these documents based upon the fact that they were communications with in-house counsel and were thus privileged. The transcript reveals that prior to trial, the district court sustained the motion in limine because the judge failed to see the relevancy of these documents. We also fail to see how these documents are relevant to Gagnon's "totality of the circumstances" argument that he raises on appeal . Gagnon is not making a claim concerning the internal investigation conducted by Sprint PCS regarding Gagnon's claim of discrimination or retaliation. We hold that the district court did not abuse its discretion in excluding Exhibits 37, 38, 39, 252, and 294 in its pre-trial ruling.

Gagnon's last evidentiary challenge is the district court's exclusion of evidence regarding a salary increase given to another Sprint PCS employee after the dates relevant to Gagnon's employment at Sprint PCS. Gagnon sought to introduce this evidence to prove that Sprint PCS does in fact entertain raises above fifty percent, contrary to proffered trial testimony. However, we find the district court did not abuse its discretion when it found that any evidence of Sprint PCS's policies regarding compensation in 1999 or 2000 are irrelevant in the instant case as to compensation policies in 1997 and 1998. We affirm the ruling of the district court.

III.   CONCLUSION

We reverse the district court's grant of Sprint PCS's motion for JAML on Gagnon's claim of discrimination under Title VII and the MHRA. The district court's grant of JAML on Gagnon's claim of retaliation under Title VII and the MHRA, its summary judgment on Gagnon's claims of discrimination and retaliation under the

USERRA, as well as its rulings regarding pre-trial discovery and trial evidentiary matters stand affirmed.  We remand for further proceedings consistent with this opinion.


A true copy.


Attest:


CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.