Martin SKOMSKY, Plaintiff,

v.

SPEEDWAY SUPERAMERICA, L.L.C., Defendant.

No. CIV. 02–1297(PAM/RLE).

United States District Court, D. Minnesota.

June 13, 2003.

Marcy S. Wallace, Cox, Goudy, McNulty & Wallace, Minneapolis, MN, for Plaintiff.

Marko J. Mrkonich, Stephanie D. Sarantopoulos, Littler Mendelson, Minneapolis, MN, for Defendant.

## MEMORANDUM AND ORDER

MAGNUSON, District Judge.

This matter comes before the Court on Defendant's Motion for Summary Judgment on Plaintiff's claims. For the following reasons, the Court grants the Motion in part and denies the Motion in part.

## BACKGROUND

On February 5, 1997, Douglas Muchow, a management employee of Defendant Speedway SuperAmerica Inc. ("SA"), hired Plaintiff Martin Skomsky as a delivery truck driver for SA's convenience store locations. On November 28, 2000, Skomsky suffered a stroke and was diagnosed with vertigo and high blood pressure as a result. Skomsky took leave under the Family Medical Leave Act, 29 U.S.C. §§ 2601, 2611–19, 2631–34, 2651–54, 5 U.S.C. §§ 6381–87, from December 21, 2000 through March 15, 2001. Skomsky then requested and received personal leave up to and including June 10, 2001. During his leave, Skomsky kept SA informed of his treatment and prognoses.

On May 15, 2001, Skomsky's doctor, David Smith, completed a medical release form indicating that Skomsky was able to perform all of the duties of his previous job. Dr. Smith also indicated the following: "Martin can return to work, he is able to perform all job duties only limits are driving, car or van 'no limits,' trucks Martin will have to feel his way as he tries this." (Sarantopoulos Aff. Ex. A–15.) Although somewhat unclear, the Court interprets this statement to mean that Skomsky was cleared to drive cars and vans. With regard to driving trucks, Dr. Smith concluded that Skomsky may or may not have to gradually take on full-time truck-driving duties through trial and error.

When Skomsky discussed the release form and his possible return to work with his supervisors, he expressed reservations about his abilities to drive the delivery truck alone on his first day back. In accordance with Dr. Smith's recommendation, Skomsky suggested that another SA employee accompany him on his first day back, just in case he was unable to complete any tasks. SA had allowed such "ride alongs" in the past to employees returning from lengthy disability leaves. Muchow relayed Skomsky's self-doubt and ride-along request to the human resources department. Muchow informed Skomsky that he was forwarding his request to human resources. Less than two weeks later, Marilyn Krenik, one of Skomsky's administrative supervisors, left a message on Skomsky's answering machine notifying him that SA had terminated his employment. Skomsky's request for a ride along had been denied, and SA did not allow Skomsky to attempt to return to work alone.

Shortly before Skomsky's termination, Muchow had encouraged him to apply for a job at the company's commissary warehouse. The position would not require driving a truck. Skomsky applied for the position on May 15, 2001, but SA had filled the position a week earlier.

Skomsky originally brought the current action alleging both disability and age discrimination. In addition, Skomsky pled a claim based on both actual disability and "regarded as" disabled under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102(2)(C). SA has filed a summary judgment on all three distinct claims. At oral argument, Skomsky informed the Court that he had voluntarily dismissed the age discrimination and the actual disability claim. Therefore, only the "regard-

ed as" disability claim remains. SA's Motion for summary judgment on this claim is based solely on a challenge to Skomsky's prima facie case of "regarded as" disabled.

## DISCUSSION

### A. Standard of Review

Defendant moves for summary judgment pursuant to Rule 56(c), which provides that such a motion shall be granted only if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the non-moving party. *Enter. Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir.1996). The burden of demonstrating that there are no genuine issues of material fact rests on the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party has carried its burden, the non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Krenik v. County of LeSueur,* 47 F.3d 953, 957 (8th Cir.1995).

### B. Recent Supreme Court Decision

 Prior to the recent Supreme Court decision in *Desert Palace, Inc. v. Costa,* —— U.S. ——, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), all of Gonzalez's claims for discrimination and retaliation would have been analyzed under the traditional burden-shifting paradigm articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this approach, once a plaintiff has established a prima facie case of discrimination, the de-

fendant has the burden to articulate a legitimate, non-discriminatory reason for its decision. At that point, the burden would shift back to the plaintiff to show that the defendant's proffered legitimate reason for the employment action was a pretext for an illegitimate, discriminatory motive. The alternatives to the *McDonnell Douglas* pretext scheme are those articulated in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 269–70, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) and the Civil Rights Act of 1991.

In *Price Waterhouse,* the four-justice plurality determined that mixed-motive cases required a different test than single-motive cases. *Id.* at 240 n. 6, 109 S.Ct. 1775. Instead of requiring the defendant to articulate a legitimate, nondiscriminatory reason for the employment action and requiring the plaintiff to prove that the proffered reason is a pretext for discriminatory motive, the defendant would have to show, by a preponderance of the evidence, that it would have made the same decision regardless of the plaintiff's membership in a protected class. *Id.* at 258, 109 S.Ct. 1775. This test has come to be known as "the same decision test." In her concurring opinion, now considered the controlling opinion, Justice O'Connor narrowed the reach of the four-justice plurality by concluding that the defendant should bear the burden of proof in mixed-motive cases only where the plaintiff has first presented direct evidence that the employer's "decisional process has been substantially infected by discrimination." *Id.* at 269–70, 109 S.Ct. 1775.

Subsequently, the Eighth Circuit instructed lower courts to analyze cases under either the *McDonnell Douglas* or the *Price Waterhouse* paradigm depending entirely on whether the plaintiff had presented direct or indirect evidence of discrimination:

The framework for evaluating a Title VII discrimination claim depends on the type of evidence presented in support of the claim. Where the plaintiff relies primarily on circumstantial evidence, courts apply a tripartite analysis as set forth in [*McDonnell Douglas* ]. . . .

In some situations, however, a plaintiff can produce direct evidence that an illegal criterion was a motivating factor in the disputed employment decision. . . . In those cases, the plaintiff is relieved of the ultimate burden of persuasion and the so-called "mixed motive" analysis is applied.

*Mohr v. Dustrol, Inc.* 306 F.3d 636, 639–40 (8th Cir.2002) (citing *Price Waterhouse,* (generally) and *Gagnon v. Sprint Corp.,* 284 F.3d 839, 847–49 (8th Cir.2002)). Only rarely did plaintiffs present direct evidence of a discriminatory motive. Thus, application of the *McDonnell Douglas* paradigm was much more common than the alternative burden-shifting scheme set forth in *Price Waterhouse* and revised by the Civil Rights Act of 1991.

Shortly after the Supreme Court issued its opinion in *Price Waterhouse,* Congress enacted the Civil Rights Act of 1991, which amended Title VII. The Civil Rights Act of 1991 states that a plaintiff satisfies its burden of proof when he "demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice." 42 U.S.C. § 2000e–2(m). In response, a defendant may avoid having to pay damages by proving an affirmative defense that it "would have taken the same action in the absence of the impermissible motivating factor." 42 U.S.C. § 2000e–5(g)(2)(B). Thus, instead of requiring the defendant to produce a legitimate, nondiscriminatory reason and then shifting the burden of proof to plaintiff to prove that this proffered nondiscriminatory reason was false and a pretext

for a discriminatory motive, the defendant bears the burden of proof on the "same decision test."

In *Costa v. Desert Palace, Inc.,* 299 F.3d 838 (9th Cir.2002), *cert. granted,* 537 U.S. 1099, 123 S.Ct. 816, 154 L.Ed.2d 766 (2003), the Ninth Circuit examined how the Civil Rights Act of 1991 affected the direct/indirect evidence distinction made by Justice O'Connor in her concurrence to *Price Waterhouse.* The Ninth Circuit questioned the validity of this distinction, noting that Congress intended to overrule the plurality opinion in *Price Waterhouse* when it enacted the Civil Rights Act of 1991:

> The legislative history evinces a clear intent to overrule *Price Waterhouse.* In a subsection titled "The Need to Overturn *Price Waterhouse,*" the report accompanying the 1991 Civil Rights Act reflects congressional concern that the "inevitable effect of the Price Waterhouse decision [was] to permit prohibited employment discrimination to escape sanction under Title VII."

*Costa,* 299 F.3d 838, 850 (quoting H.R.Rep. No. 102–40(I), at 46 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549, 584). The Ninth Circuit quoted the report further: "[t]he effectiveness of Title VII's ban on discrimination on the basis of race, color, religion, sex, or nation origin has been severely undercut by the recent Supreme Court decision in *Price Waterhouse v. Hopkins.*" *Id.* Because the Civil Rights Act of 1991 makes no mention of Justice O'Connor's direct/indirect evidence distinction, the Ninth Circuit concluded that Congress had nullified the distinction's legal effect. *Id.* (the legislative history shows beyond doubt "that the premise for Justice O'Connor's comment is wholly abrogated. . . . Consequently, there is no longer a basis for any special 'evidentiary scheme' or heightened

standard of proof to determine 'but for' causation.").

On June 9, 2003, the Supreme Court unanimously affirmed the Ninth Circuit, holding that a plaintiff need not offer direct evidence of discriminatory motive to proceed under a mixed-motive analysis. *Desert Palace*, 123 S.Ct. at 2154 ("we agree with the Court of Appeals that no heightened showing is required under § 2000e–2(m)"). Thus, the Supreme Court abrogated the direct/indirect evidence distinction articulated in Justice O'Connor's *Price Waterhouse* concurrence.

The Supreme Court based its decision on the fact that "the words of the statute are unambiguous" and that "the statute does not mention, much less require, that a plaintiff make a heightened showing through direct evidence." *Desert Palace*, 123 S.Ct. at 2154. By abrogating the distinction made in Justice O'Connor's *Price Waterhouse* concurrence, the Supreme Court eviscerated the effect of the instruction to lower courts given by the Eighth Circuit in cases such as *Mohr* and *Gagnon.*

In this case, Skomsky alleges discrimination on the basis of perceived disability under the ADA. However, Skomsky originally also alleged that SA considered multiple illegitimate motives because he brought a separate claim under the Age Discrimination in Employment Act, 29 U.S.C. § 623(a). Thus, Skomsky pled a mixed-motive case. Pursuant to the Supreme Court's decision in *Desert Palace*, the case must be analyzed according to the provisions of 42 U.S.C. § 2000e–2(m) and § 2000e–5(g)(2)(B).

█ Federal anti-discrimination laws such as the ADA are patterned after Title VII, and as such should be evaluated similarly. The interests of uniformity require the Court to extend the burden-shifting paradigm articulated in 42 U.S.C. § 2000e–2(m) and § 2000e–5(g)(2)(B) to

ADA disparate treatment claims, including perceived disability claims. In *Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1135–36 (8th Cir.1999), the Eighth Circuit held that ADA disparate treatment claims are subject to the same analysis as Title VII claims and concluded that because Kiel did not offer direct evidence of a discriminatory motive, the District Court properly analyzed his claim under the *McDonnell Douglas* burden-shifting framework. In addition, the ADA itself expressly adopts the procedures set forth in 42 U.S.C. § 2000e–5:

> The powers, remedies, and procedures set forth in sections 2000e–4, 2000e–5, 2000e–6, 2000e–8, and 2000e–9 of this title shall be the powers, remedies, and procedures this subchapter provides to the Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter, or regulations promulgated under section 12116 of this title, concerning employment.

42 U.S.C. § 12117(a). Therefore, for the sake of uniformity and for the same reasons that the Eighth Circuit has previously and repeatedly held that courts should analyze ADA claims according to the same analysis that Title VII claims require, the Court will consider Skomsky's ADA claim under the allocation of burdens set forth in 42 U.S.C. § 2000e–2(m) and § 2000e–5(2)(B). SA shall have an opportunity to file a motion for summary judgment on its affirmative defense under 42 U.S.C. § 2000e–5(2)(B), even though the dispositive motion deadline has passed.

### C. "Regarded as" Disabled

█ To establish a prima facie case of disparate treatment on the basis of disability, Skomsky must show that (1) he has a "disability" within the meaning of the ADA, (2) he is a "qualified individual" un-

der the ADA, and (3) he "suffered an adverse employment action as a result· of the disability." *See Fenney v. Dakota, Minnesota & E.R. Co.,* 327 F.3d 707, 711 (8th Cir.2003). The parties dispute the first element only, whether Skomsky has a disability within the meaning of the ADA. To meet this first element, Skomsky may show that he is actually disabled, which means that he is substantially limited in at least one major life activity. Alternatively, Skomsky may attempt to establish that he is regarded as disabled, or that he has a record of disability. While Skomsky initially brought a claim under both actual and perceived disability, he subsequently withdrew the actual disability claim.

■ To meet the definition of "regarded as" disabled, a plaintiff must show that the "employer or potential employer 'entertained misperceptions about the individual—it must have believe[d] either that one ha[d] a substantially limiting impairment that one did not have or that one ha[d] a substantially limiting impairment when, in fact, the impairment [was] not so limiting.'" *Conant v. City of Hibbing,* 271 F.3d 782, 785 (8th Cir.2001) (quoting *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)). Skomsky specifies in his opposition memorandum that his claim falls under the first category. That is, he alleges that SA mistakenly believed that he had a substantially limiting impairment, when in fact he did not.

■ To meet the definition of "regarded as" disabled, Skomsky must in turn present evidence that SA perceived that his disability was a substantially limiting one. " '[S]ubstantially' in the phrase 'substantially limits' suggests 'considerable' or 'to a large degree.'" *Toyota Motor Mfg., Kentucky, Inc. v. Williams,* 534 U.S. 184, 196–97, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). "The word 'substantial' thus clearly pre-

cludes impairments that interfere in only a minor way with the performance of manual tasks from qualifying as disabilities." *Id.* "The impairment's impact must also be permanent or long-term." *Id.* (quoting 29 C.F.R. §§ 1630.2(j)(2)(i)-(iii)); *see also Philip v. Ford Motor Co.,* 328 F.3d 1020, 1023 (8th Cir.2003) (quoting 29 C.F.R. §§ 1630.2(j)(2)(i)-(iii)).

■ In *Fjellestad v. Pizza Hut of Am., Inc.,* 188 F.3d 944, 949 (8th Cir.1999), the Eighth Circuit set forth factors to consider when deciding if a plaintiff was regarded as substantially limited in the major life activity of working:

> A person is substantially limited in working if she is significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities. The factors to be considered include: the number and type of jobs from which the impaired individual is disqualified; the geographical area to which the individual has reasonable access; and the individual's job training, experience, and expectations.

*Id.* (quotations omitted). Therefore, Skomsky must at least create a question of fact on whether SA believed that he suffered from an impairment that had a considerable and permanent or long-term impact that rendered him unable to perform the broad category of truck-driving jobs.

To support his case, Skomsky presents evidence that SA ultimately discharged him because it believed that he could not perform the essential functions of his delivery position. (Cox Aff. Ex. E at 34 ("[W]e are going to have to terminate you being that you cannot perform all of the essential functions of your job.").) In response, SA claims that: (1) Skomsky failed to specify which members of management

regarded him as disabled; (2) "truck driving" is not a broad class of jobs, but instead a subclass of "driving" jobs; (3) SA did not believe that Skomsky's impairment was long-term or substantially limiting; and (4) SA based its decision to fire Skomsky on *his own* perception of what impact his impairment had on his abilities, not on SA's perception of it.

■ SA cites *Conant*, 271 F.3d at 785, for the proposition that Skomsky must specify which members of management regarded him as disabled. *Conant* does not stand for this proposition, however. Instead, in *Conant*, the Court held that an employee could be unable to perform the particular requirements of a job without being unable to perform the life activity of working. *Id.* In addition, the *Conant* court determined that the mere fact that the employer knew of the employee's past medical condition is insufficient to establish that the employer regarded the employee as disabled. *Id.* at 786. Accordingly, Skomsky is not required to specify which individuals regarded him as disabled. Moreover, Skomsky has alleged that Marilyn Krenik left a message on his answering machine notifying him of SA's decision to discharge him. In addition, Skomsky has named individuals, such as Muchow, who supervised him and who discussed his abilities and alleged disability with the human resources department. Thus, Skomsky identifies these individuals and the individuals at the human resources department as those who regarded him as disabled.

Second, SA argues that even if it perceived Skomsky's injury as rendering him unable to perform the activity of truck driving, it did not regard Skomsky as disabled under the ADA because the activity of truck driving does not constitute a broad category of jobs. Instead, SA claims that it is a subcategory of the broader class of driving jobs.

Some courts have held that a plaintiff's inability to perform the duties of a specific kind of driving, such as long-haul driving, does not constitute a substantial limitation in the activity of working. *EEOC v. J.B. Hunt Transp., Inc.*, 321 F.3d 69, 75–76 (2d Cir.2003) (long-haul, or "over the road" truck driving is subclass of truck driving and of driving in general); *Baulos v. Roadway Exp. Inc.*, 139 F.3d 1147, 1153 (7th Cir.1998) (holding that plaintiffs suffering from sleep deprivation were unable to perform duties of driving "sleeper trucks," (trucking routes that required one of the drivers to sleep while the other driver drove the truck), but were not unable to perform the duties of other kinds of truck driving; court did not reach whether truck driving is sufficiently broad); *see also Sutton*, 527 U.S. at 492, 119 S.Ct. 2139 (holding that pilots unable to make long international flights were not unable to perform broad class of jobs because they could still qualify for jobs as pilots making shorter, regional flights).

In this case, Skomsky was required to operate a 40–foot straight bed truck on short-distance routes. (Cox. Aff. Ex. E at 1.) If a driver is unable to operate the basic delivery truck on the short-distance routes at issue in this case, then the driver is not able to drive heavier trucks, with heavier loads, for longer distances. SA specified nothing in particular about operating this kind of truck on these types of routes that would differentiate the delivery position from other kinds of truck driving. Thus, SA regarded Skomsky as unable to perform the duties of truck-driving jobs, in general. SA contends that it did not perceive Skomsky as substantially limited in the life activity of working because it believed that he was able to perform the duties of the broad class of driving jobs.

The question is whether the category of truck-driving jobs is a broad enough category to constitute the major life activity of working or whether it is merely a subcategory within the larger class of driving jobs. The Court holds that the activity of commercial truck driving is distinct from other kinds of driving jobs and a sufficiently broad category of jobs to constitute the activity of working, as contemplated by the ADA.

The Court also rejects SA's third reason why it did not perceive Skomsky's disability as substantially limiting. SA claims that it did not regard Skomsky's disability as having a permanent or long-term impact. *See Toyota Motor Mfg., Kentucky, Inc.*, 534 U.S. at 196–97, 122 S.Ct. 681 (quoting 29 C.F.R. §§ 1630.2(j)(2)(i)-(iii)); *Philip*, 328 F.3d at 1023 (same). Rather, SA asserts that it believed Skomsky's disability was only a temporary impairment. The facts, however, belie this position. First, the portions of the record on which SA's position stands do not indicate that SA believed the injury was short-term in nature. SA refers to deposition statements made by Muchow and Roger Lienhard, Skomsky's direct supervisor. These statements reflect that SA wanted Skomsky to return at full capacity, but they do not indicate whether SA expected or perceived that Skomsky would fulfill their hopes for his return. Second, when presented with Skomsky's request for a one-day ride along for his first day back on the job, SA had at least three options before it: it could (1) grant his request for a ride along; or (2) deny his request and allow him to attempt to complete the delivery route on his first day back without assistance; or (3) terminate his employment altogether. SA made the third choice. The logical inference that the Court draws from this fact undermines SA's challenge to Skomsky's "regarded as" disabled claim. A juror could infer that SA denied Skomsky the opportunity to perform the job without assistance because it perceived that his disability would prevent him from driving the delivery truck for a lengthy period of time.

Likewise, SA's fourth argument lacks the factual and evidentiary support necessary to eliminate questions of fact and permit summary judgment. SA contends that it based its decision to fire Skomsky on *his own* perception of what impact his impairment had on his abilities, not on SA's perception of it. Drawing all inferences from the facts in Skomsky's favor, a reasonable juror could disagree with SA's contention. Skomsky's medical release indicated that he was fully capable of performing all of the duties of his job. (Sarantopoulos Aff. Ex. A–15.) While Skomsky was hesitant to have the responsibilities of driving the truck to himself on his first day back, SA should not have leapt to the conclusion that Skomsky could not do the job in light of the expressed provisions of the medical release from Dr. Smith. In addition, SA refused to permit him to have a ride along, even though this practice had been followed for other workers in the past. Skomsky's request comported with both his doctor's release and company policy. Thus, the Court infers that SA's perception of Skomsky's disability differed from its perception of the other employees' disabilities who were permitted a ride along. Finally, Skomsky did not state that he could not perform the duties of his job. Instead, he undisputedly conveyed only that he was uncertain about his ability to perform the duties of his job. In the face of this uncertainty, SA's decision to discharge Skomsky without giving him the opportunity to perform the duties of the job shows that it considered something beyond Skomsky's own perception of his abilities and disability. Therefore, questions of fact remain on whether SA be-

lieved that Skomsky had a disability that substantially limited his ability to perform the duties of his job.

## CONCLUSION

SA seeks summary judgment on Skomsky's "regarded as" disabled claim by arguing that Skomsky has failed to establish a prima facie case of disability discrimination. However, fact issues remain on whether SA regarded Skomsky as disabled. Accordingly, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion for Summary Judgment (Clerk Doc. No. 20) is **DENIED;** and

2. In light of the Supreme Court's decision in *Desert Palace,* Defendant has until June 20, 2003, to file a motion for summary judgment on its affirmative defense to damages under 42 U.S.C. § 2000e–5(2)(B); if filed, Plaintiff has until June 27, 2003 to respond to the motion; Defendant has until July 3, 2003 to reply to Plaintiff's response.