**Reed E. ROBERTS and Miguel Chavarria, Plaintiffs,**

v.

**SWIFT AND COMPANY, Defendant.**

No. 4–00–CV–90366.

United States District Court,
S.D. Iowa,
Central Division.

April 25, 2002.

Jeffrey C. Peterzalek, Waterloo, IA, for plaintiffs.

Russell L. Samson, Rebecca B. Parrott, Des Moines, IA, for defendant.

## MEMORANDUM OPINION AND ORDER

PRATT, District Judge.

The Plaintiffs, Reed Roberts and Miguel Chavarria, filed this lawsuit for employment discrimination under Title VII of the Civil Rights Act of 1964 and the Iowa Civil Rights Act ("ICRA") on July 17, 2000. The allegations arise out of Plaintiffs' discharge from employment at the Marshalltown facility of Defendant, Swift & Company ("Swift"). Now before the Court is Defendant's motion for summary judgment, which is resisted by Plaintiffs. For the foregoing reasons, the motion is granted in part and denied in part.

## I. FACTUAL BACKGROUND

The defendant, Swift, operates a pork processing plant in Marshalltown, Iowa. Plaintiffs Reed Roberts, an African American male, and Miguel Chavarria, a Mexican male, were two of nine individuals discharged from employment at Swift on July 17, 1998. In addition to Mr. Roberts and Mr. Chavarria, Swift terminated four white males and three white females. Five of the nine terminated employees were production supervisors; Mr. Roberts and Mr. Chavarria were the only minority supervisors terminated.

Swift's decision to terminate nine employees in July 1998 arose out of a collaborative analysis by Swift's corporate office and management personnel at the Marshalltown plant. Fifteen to thirty days prior to the plaintiffs' discharge, Mike Weber, Vice President and General Manager of the Marshalltown plant, had a conversation with Bernie Prozcek, Vice Presi-

dent of Operations at Swift's corporate office in Greeley, Colorado, regarding the need to reduce expenses at the Marshalltown plant. The need was identified through a joint analysis by members of management at the Marshalltown plant and the corporate office in which the overall expenses and the number of employees in management positions at the Marshalltown plant were compared with other Swift plants. The corporate office provided no specified criteria to reduce expenses, so as one part of the overall cost reduction effort, Mr. Weber personally decided to cut non-bargaining unit personnel, which included the plaintiffs' positions.

Mr. Weber stated that his decision regarding which employees would be terminated in the cost reduction effort was guided by "no given, specific criteria" other than the number of management personnel on each production line and "how well ... the line was doing." To determine "how well the line was doing," Mr. Weber looked at yields, profitability of the line, efficiency of the line, the management person's teamwork and ability to get along with others. Mr. Weber's stated reason for terminating Mr. Roberts was that Mr. Roberts was one of two supervisors on the ham production line. Jenny Mora, a white female, was retained to supervise the ham line. Based on the above criteria, Mr. Weber believed that Ms. Mora was the more "qualified" supervisor.

Mr. Weber decided that Mr. Chavarria would be terminated because he, like Mr. Roberts, was one of two supervisors on his production line. Mr. Weber also considered that Mr. Chavarria had production problems arising out of Mr. Chavarria's dissatisfaction with his assignment to a particular area of the production line. The supervisor retained on the loin line, Don Box, was white.

When making the decision to terminate Mr. Roberts, Mr. Weber "was informed of ... how well [Roberts] worked with other supervisors and how well he was a team player." Specifically, Mr. Weber stated that he was informed that Mr. Roberts "didn't always get along with his superior." It is unclear who informed Mr. Weber of Mr. Roberts' inability to "get along." Performance evaluations for each of the plaintiffs were done by their immediate supervisor, Mitch Fricke. Nonetheless, Mr. Weber testified that he did not receive assistance or input from Ms. Mora or Mr. Fricke when deciding which employees would be terminated.

The Personnel Change Notice issued to the plaintiffs by Swift cited a Reduction in Force ("RIF") as the reason for termination. Mr. Roberts was told that his termination "had nothing to do with [his] job performance ... [or] seniority...."

Within five months of the plaintiffs' termination, Swift had restored the number of supervisory positions on the ham and loin lines to two. In December 1998, Jim Balm, a white male, was hired from outside Swift to act as production supervisor on the loin line, the position formerly held by Mr. Chavarria. About this same time, Mitch Fricke, a white male, was given the position of production supervisor on the ham line, the position formerly held by Mr. Roberts. Prior to this change, Mr. Fricke served as Mr. Roberts' General Foreman and immediate supervisor. Within a month of their termination, Swift offered the plaintiffs new supervisory positions. These offers were made after the plaintiffs filed complaints with the Iowa Civil Rights Commission.

## A. REED ROBERT'S EMPLOYMENT HISTORY

Mr. Roberts was first employed by Swift from 1989 until February 1994. Mr. Roberts was promoted from production employee to production supervisor in January

1990 and continued in that capacity until he left Swift in February 1994 to pursue employment at another business establishment. In 1995, Mr. Roberts returned to Swift when he was offered a position as production supervisor and his income requirements were accommodated. In 1996, Mr. Roberts received a "superstar bonus" in the form of a $1,500 salary increase reserved for the top supervisors in the plant. At the time of his termination in 1998, he was a production supervisor in the ham boning department.

On or about May 1997, Mr. Roberts requested that Swift move him from second shift to first shift so he could spend more time with his child. The move was allowed. Subsequently, Mr. Roberts asked that Swift place him on the cut floor instead of the boning floor so he would not have to work on Saturdays. This request was denied. Mr. Roberts testified that he was assigned to the boning floor, while two less qualified white male supervisors were given first-shift cut floor positions.

Mr. Roberts was involved on a number of occasions in confrontations with his superiors and other employees. On one occasion, Mr. Roberts arrived at work for the second shift and approached Dave Feeback, a first-shift General Foreman, and asked, "How many hogs did you guys cut?" Mr. Feeback responded, "I don't know. What the hell do I look like, a hog counter?" Mr. Roberts then said, "Hey man, I didn't ask you to get smart with me. All I asked you was how many hogs you had cut so we would know how many we had." In February 1998, Mr. Roberts refused to work with Nora Earney and requested that he be allowed to work with a male employee. Mr. Roberts claims that Ms. Earney had admitted to him that she had hidden weight tickets in order to sabotage the yield analysis of another employee and that he did not trust her to work on his line. On April 6, 1998, during a verbal confrontation arising out of tense working conditions, Mr. Roberts called Monica Halverson, an hourly employee, a "fat fuck" when she asked him to move out of her way.

Mr. Roberts was also documented several times for poor work quality. On May 8, 1998, Mr. Roberts had production problems on the butt line. On May 13, 1998, while Mr. Roberts was running the butt line, the line suffered a loss of $10,000. On May 20, 1998, while running the butt line, Mr. Roberts failed to weigh the product as required.

### B. MIGUEL CHAVARRIA'S EMPLOYMENT HISTORY

Mr. Chavarria, a non-resident alien authorized to work in the United States, was employed by Swift from August 1993 to July 1998. He was terminated for fighting on June 5, 1997 and was reinstated on June 13, 1997. On September 11, 1997, Mr. Chavarria was promoted to production supervisor in the loin boning department and continued working in that capacity until his termination in July 1998.

At some time after he became a loin line supervisor, the lion line was split between two supervisors. Mr. Chavarria was assigned to the packaging end of the loin line and another supervisor was assigned to the production end. Mr. Chavarria did not adjust well to working on the packaging end of the loin line. He requested that he be assigned to the production end. His request was granted, but his work did not improve and he was transferred back to the packaging end of the loin line. On May 26, 1998, Mr. Chavarria was called to a meeting to discuss this poor performance and was advised by Tony Harris, Swift's Human Resource Director, and Mr. Weber, that "if his personal job performance did not improve he would be released from

his job." On that same date Mr. Weber instructed Mr. Chavarria that he "should not give up simply because he did not like the idea of primarily supervising the packaging end of the loin line."

## C. ALLEGED DISCRIMINATORY ANIMUS AGAINST AFRICAN AMERICANS

### 1. MIKE WEBER, PLANT MANAGER

Mr. Roberts testified that he was treated "differently" by Mr. Weber than similarly situated white supervisors. Mr. Roberts testified that he was required to work more Saturdays than other supervisors, was denied shift changes that other less qualified white supervisors were given, and was threatened more often with the loss of his job than his white counterparts. Mr. Roberts testified that he never personally witnessed Mr. Weber make a derogatory comment regarding African Americans or any other race or national origin. Nevertheless, Mr. Roberts offered testimony regarding incidents that allegedly show Mr. Weber's discriminatory animus against African Americans and his acceptance of discriminatory animus at the plant.

Mr. Roberts claims that in 1998, Mark Stewart, an African American engineer employed by Swift, told him that Mr. Weber had made the following comment in a meeting: "Well, we don't have any minority contractors, and none of them have come to us, so we don't have to worry about having any minority contractors with Swift here at the plant." Mr. Roberts claims that in 1998, Claude Wilkens, an African American maintenance supervisor, told Mr. Roberts that Mr. Weber scrutinized him and threatened him with termination more often than his white counterparts. Mr. Roberts also testified that Mr. Weber refused to promote L.C. Buckley, an African American supervisor, to the position of general foreman. According to Mr. Roberts, Kenny Foley, a white super-

visor that had allegedly been involved with a drug crime, was given the general foreman position and it was not until Kenny Foley was involved in a subsequent drug crime and incarcerated that L.C. Buckley was promoted to the position. Mr. Weber stated in his supplemental affidavit that he was not involved in the promotion of Kenny Foley, but did promote L.C. Buckley.

### 2. CO-WORKERS

In April or May 1998, while Jenny Mora was a production supervisor on the ham line with Mr. Roberts, she allegedly made the following statement to Mr. Roberts: "Here you go, Reed. Here's a piece of watermelon candy. You guys like watermelon candy, don't you? That's what you guys like, isn't it, watermelon and chicken?" Mr. Harris testified that this incident was not reported to him. Mr. Roberts testified that on a previous occasion, Victor Jones, an African American employee, told Mr. Roberts that Jenny Mora called him a "fucking nigger." Mr. Harris testified that this incident was reported to Swift management, was investigated, and did not warrant the dismissal of Ms. Mora. Mr. Weber was at least vaguely aware in July 1998 of the allegations surrounding both incidents. Ms. Mora was promoted to the position of general foreman in 1999.

In the spring of 1998, Mr. Roberts overheard Hank Stagner, a supervisor on second shift, refer to his ex-girlfriend's boyfriend as a "nigger." On another occasion, Mr. Roberts overheard Mike Bishop, a second shift supervisor, call Mr. Roberts' white girlfriend a "nigger lover." Neither of these incidents were brought to the attention of Swift management. In addition, Mr. Roberts testified that he never heard his immediate supervisor, Mitch Fricke, make derogatory comments toward African Americans.

### D. ALLEGED DISCRIMINATORY ANIMUS AGAINST PERSONS OF MEXICAN DESCENT

According to Mr. Roberts, Mitch Fricke, the plaintiffs' immediate supervisor, on at least a dozen occasions between June 1997 and July 1998, made derogatory comments toward persons of Mexican descent. On several occasions he referred to Mexicans as "wetbacks," "sorry or lazy" and "over here just to be given things." Mr. Roberts testified that he had not heard Mitch Fricke make derogatory comments toward any other race or national origin. Mr. Harris testified that these incidents were never reported to him.

Mr. Roberts also stated that Mr. Chavarria was treated "differently" than his similarly situated white supervisors. He testified that Mr. Chavarria was required to figure yields at the end of each day, while the other white supervisor on Mr. Chavarria's line was not required to do so. As a result, Mr. Chavarria often missed safety meetings and was required to work longer hours than the other white supervisor. Mr. Roberts also testified that Mr. Chavarria was required to work more Saturdays than any other supervisor and was not given as much time off as other similarly situated supervisors.

### II. SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir.1992), *cert. denied*, 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993). Summary judgment "allows courts and litigants to avoid full-blown trials in unwinnable cases, thus conserving the parties' time and money and permitting courts to [conserve] scarce judicial resources." *Id.*

The precise standard for granting summary judgment is well-established and oft-repeated: summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994). The Court does not weigh the evidence nor make credibility determinations, rather the court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

This holds particularly true in employment discrimination cases. "Summary judgment should seldom be granted in discrimination cases because such cases often depend on inferences rather than direct evidence." *Bradley v. Widnall*, 232 F.3d 626, 631–32 (8th Cir.2000) (*citing Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994)). Nevertheless, while "summary judgment should seldom be granted in employment discrimination cases, if the plaintiff fails to establish a factual dispute on each element of the prima facie case, summary judgment is appropriate." *Weber v. American Exp. Co.*, 994 F.2d 513, 515–16 (8th Cir.1993). "Summary judgment is not appropriate unless all the evidence points one way and is susceptible to no reasonable inferences sustaining the position of the non-moving party." *Hindman v. Transkrit Corp.*, 145 F.3d 986, 990 (8th Cir.1998).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affida-

vits, if any. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *cited in Handeen v. Lemaire,* 112 F.3d 1339, 1345 (8th Cir.1997); *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is genuine issue for trial. Fed.R.Civ.P. 56(c), (e); *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis added). An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material ... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

## III. DISCUSSION

■ Mr. Roberts and Mr. Chavarria claim that Swift discriminated against them in violation of the Title VII of the Civil Rights Act of 1964 and the ICRA. Federal case law supplies the basic framework for deciding cases under the ICRA. *Quick v. Donaldson Co., Inc.,* 90 F.3d 1372, 1380 (8th Cir.1996) (citing *Iowa State Fairgrounds Sec. v. Iowa Civil Rights Comm'n,* 322 N.W.2d 293, 296 (1982)). Iowa courts "traditionally turn to federal law for guidance on evaluating the ICRA, but federal law ... is not controlling." *Vivian v. Madison,* 601 N.W.2d 872, 873 (Iowa 1999) (citations omitted). The plaintiffs do not offer any separate legal arguments relating to the ICRA; therefore,

their Title VII and ICRA discrimination claims are analyzed together.

Title VII provides that "[i]t shall be an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race ... or national origin." 42 U.S.C.2000e–2(a)(1). Plaintiffs can establish employment discrimination under Title VII using the direct evidence framework set forth in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), or the circumstantial evidence framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–803, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Gagnon v. Sprint Corp.,* 284 F.3d 839, 845, 847–48 (8th Cir.2002).

### A. DIRECT EVIDENCE FRAMEWORK

■ Under the direct evidence framework enunciated in *Price Waterhouse,* "once [the] plaintiff introduces direct evidence of discrimination, the burden shifts to the employer to show, by a preponderance of the evidence, 'that it would have made the same decision even if it had not taken the plaintiff's [race or national origin] into account.' " *Ross v. Douglas County, Nebraska,* 234 F.3d 391, 397 (8th Cir.2000) (quoting *Price Waterhouse,* 490 U.S. at 258, 109 S.Ct. 1775).

As modified by section 107 of the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e–5(g)(2), the [*Price Waterhouse* ] model allows for declaratory relief, injunctive relief, attorney's fees and costs once [the plaintiff] meets his initial burden regarding direct evidence. 42 U.S.C. §§ 2000e–5(g)(2)(B)(i). Thus, [the defendant] is liable for discrimination under this model upon direct evidence that

it acted on the basis of a discriminatory motive. Whether or not [the defendant] satisfies its burden to show by a preponderance that it would have reached the same employment decision absent any discrimination is only relevant to determine whether the court may award full relief including damages, court ordered admissions, reinstatement, hiring, promotion or other such relief.

*Gagnon,* 284 F.3d 839, 847–48. Hence, if the plaintiff can demonstrate a genuine issue of material fact about whether he can meet his initial burden regarding direct evidence, then his claim must survive summary judgment because such direct evidence alone would entitle the plaintiff to recovery of declaratory and injunctive relief as well as attorney's fees and costs. Thus, evidence that the defendant offers on whether it would have subjected the plaintiff to the same employment decision regardless of discriminatory intent cannot defeat a claim altogether, it can only defeat certain remedies such as damages or equitable relief.

■ "Direct evidence is evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude in such a way that the fact finder could infer that the attitude was more likely than not a motivating factor in the employer's decision." *Gagnon,* 284 F.3d 839, 848–49. *Accord Simmons v. Oce–USA, Inc.,* 174 F.3d 913, 915 (8th Cir.1999). Nonetheless, direct evidence does not include "stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself." *Stacks v. Southwestern Bell Yellow Pages, Inc.,* 996 F.2d 200, 202 (8th Cir.1993). With these limitations in mind, Chief Judge Bennett, in *Bauer v. Metz Baking Co.,* 59 F.Supp.2d 896 (N.D.Iowa 1999), used three criteria to analyze allegedly discriminatory comments when determining if they constitute direct evidence of discrimination: speaker, content, and causal linkage to the adverse employment decision. *Id.* at 903.

■ First, the Court determines whether the speaker was involved in the decisionmaking process. *Id.* The person need not be *"the* decisionmaker," rather, the person need only be *"involved"* in the decisionmaking process. *Id.* To conclude that an immediate supervisor was not a decisionmaker simply because he lacked "full and final authority" is "too truncated a view of workplace personnel decisions and ... at odds with the reality of today's workplace where important personnel decisions often represent the collective judgment of several individuals." *Holmes v. Marriott Corp.,* 831 F.Supp. 691, 708 (S.D.Iowa 1993) (Mag. J. Bennett). *See also Browning v. President Riverboat Casino–Missouri, Inc.,* 139 F.3d 631, 635 (8th Cir.1998) (holding racial slur by supervisor and principal decisionmaker in context of plaintiff's employment was direct evidence of racial discrimination); *Meier v. Noble Hospitality, Inc.,* No. 4–00–CV—90652, 2001 WL 1848431 (S.D.Iowa Dec. 31, 2001) (finding question of whether supervisor, who allegedly made discriminatory remarks about employee's pregnancy but did not make final decision, was a "decisionmaker" raised a genuine issue of material fact). *But see Rivers–Frison v. Southeast Missouri Comm. Treatment Ctr.,* 133 F.3d 616, 619 (8th Cir.1998) (holding comments by fellow staff members uninvolved with employment decision did not establish direct evidence of racial discrimination). Furthermore, a defendant cannot avoid liability for discrimination with "multiple layers of paper review, when the facts on which the reviewers rely have been filtered by [another employee] determined to purge the labor force of protected workers." *Gagnon,* 284 F.3d 839, 848–49. A

"seemingly objective decision" is not free of discriminatory animus where "earlier discriminatory decisions lead to the adverse employment action." *Id.*

Second, the Court determines whether the content of the alleged remarks demonstrates a discriminatory animus. *Bauer*, 59 F.Supp.2d at 903. "Proof by direct evidence requires evidence that the *actual motive* behind the termination of her employment was discriminatory animus." *Clearwater v. Indep. Sch. Dist. No. 166*, 231 F.3d 1122, 1126 (8th Cir.2000) (emphasis added). To avoid summary judgment, comments cannot be "so innocuous that they fail to raise ... a jury question as to whether 'a discriminatory attitude was more likely than not a motivating factor in the employer's decision.'" *Bauer*, 59 F.Supp.2d at 904 (quoting *Kerns v. Capital Graphics, Inc.*, 178 F.3d 1011, 1018 (8th Cir.1999)).

Direct evidence of a discriminatory motive may take the form of "an admission" that a prohibited motive was the reason for an employment decision, "discriminatory references to the particular employee in a work context," or "stated hostility" toward persons of a certain race or national origin being in the work place. *Bauer*, 59 F.Supp.2d at 902 (quoting *Kerns*, 178 F.3d at 1018). On the other hand, "[s]tray remarks made in the workplace are not sufficient to establish a claim of discrimination." *Simmons*, 174 F.3d at 915. *See also Clearwater*, 231 F.3d at 1127 (finding superintendent's remarks to Native American teacher about pitching a tent, "scrub Indian ponies," and Native American student who slept in the locker room to avoid missing football practice did not constitute direct evidence of racially discriminatory motive behind teacher's termination); *Kriss v. Sprint Communications Co., Ltd. Partnership*, 58 F.3d 1276, 1282 (8th Cir.1995) (finding supervisor's act of discussing sports with men but not

women and referring to woman that worked at men's clothing retailer as "tie lady" did not display discriminatory animus towards women); *Engstrand v. Pioneer Hi–Bred Intern., Inc.*, 946 F.Supp. 1390, 1399 (S.D.Iowa 1996) (finding supervisor's comment that employee was "old and ugly woman" and "stupid" to be stray remark and not age and gender discrimination) (J. Bremer). *Compare with Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (finding comments stemming from sexual stereotypes relied upon in employment decision were not stray remarks, but provided direct evidence of gender discrimination); *Beshears v. Asbill*, 930 F.2d 1348, 1354 (8th Cir.1991) (finding age-related comments made by active participant in employment decision during the decisional process were not stray remarks).

Third, if the comment is not made in the same proximate time as the termination, the Court also determines whether there is a causal connection between the allegedly discriminatory comments and the adverse employment decision. *Bauer*, 59 F.Supp.2d at 905. *See also Simmons*, 174 F.3d at 916 (stating that where the "statements and the adverse employment decision were not close in time, [the plaintiff] must establish a causal link between the comments and his termination"). "Not all comments that may reflect a discriminatory attitude are sufficiently related to the adverse employment action in question to support such an inference." *Simmons*, 174 F.3d at 915 (finding offensive racial remarks made two years prior to employment decision were unrelated to decision-making process). *See also Walton v. McDonnell Douglas Corp.*, 167 F.3d 423, 426–27 (8th Cir.1999) (finding supervisor's statement two years before employment decision referring to other employees as "kids" was not causally linked to the em-

ployment decision and therefore not direct evidence of age discrimination); *Philipp v. ANR Freight System, Inc.,* 61 F.3d 669, 674 (8th Cir.1995) (finding decisionmaker's reference to employee as "the old man" was not linked to adverse employment decision and therefore not direct evidence of age discrimination). *Compare with Ross,* 234 F.3d at 397 (holding Chief warden's statement that former black correctional officer would not be allowed to get his job back because he was " 'black radical' who would stir up other black employees" was direct evidence of race discrimination related to employment decision); *Browning,* 139 F.3d at 635 (finding immediate supervisor's reference to employee as "that white boy" in context of employment was direct evidence of racially discriminatory attitude); *Stacks,* 27 F.3d at 1318 (finding supervisor's statement that "women in sales were the worst thing that had happened to this company" was direct evidence of gender discrimination); *Radabaugh v. Zip Feed Mills, Inc.,* 997 F.2d 444, 449 (8th Cir.1993) (holding heading, "Young Managers," on corporate planning documents enumerating company's strengths with accompanying text, "Top and middle managers are mostly young, well educated and results oriented" was direct evidence of author and employment decisionmaker's age discrimination against older employee).

### 1. ALLEGED DIRECT EVIDENCE OF RACIAL ANIMUS

#### a. Michael Weber

■ Mr. Roberts alleges three incidents to establish that Michael Weber displayed racial animus toward African American employees. First, Mr. Roberts claims that in 1998 an African American engineer told him that Mr. Weber made a comment in the engineer's presence to the effect that he did not "have to worry" about minorities contracting with Swift. Second,

Mr. Roberts claims that in 1998, an African American maintenance supervisor told Mr. Roberts that Mr. Weber scrutinized him more often and threatened him with termination more intensely than his white counterparts. Finally, Mr. Roberts alleges that Mr. Weber promoted a less qualified white employee instead of an African American employee.

The evidence provided by Mr. Roberts to establish that Mr. Weber displayed discriminatory animus against African Americans meets the first prong of the Bennett direct evidence test. There is little doubt that Mr. Weber was a "decisionmaker" in the decisional process leading to Mr. Roberts' termination. Mr. Weber admittedly identified the employees to be terminated as an overall expense reduction effort and signed the Personnel Change Notice terminating Mr. Roberts. Although Mr. Weber was a decisionmaker, evidence of these incidents cannot defeat summary judgement.

■ A claimant's "testimony recounting what [another person] allegedly told him does not raise a genuine fact issue because it is hearsay." *Churchill Bus. Credit, Inc. v. Pacific Mutual Door Co.,* 49 F.3d 1334, 1337 (8th Cir.1995) "A party opposing a motion for summary judgment 'must show that admissible evidence will be available at trial to establish a genuine issue of material fact.' " *Id.* (quoting *Fin. Timing Publ. v. Compugraphic Corp.,* 893 F.2d 936, 942 (8th Cir.1990)). "Inadmissible hearsay evidence alone may not defeat a summary judgment motion." *Firemen's Fund Ins. Co. v. Thien,* 8 F.3d 1307, 1310 (8th Cir.1993).

■ If the nonmoving party also provides admissible evidence to support his claim, the Court would be more reluctant to grant summary judgment. *Floyd v. Liberty Mut. Ins. Co.,* 978 F.2d 1263, 1992 WL 302250 *1 (8th Cir.1992). Neverthe-

less, Mr. Roberts has failed to provide even a scant amount of evidence that Mr. Weber displayed discriminatory animus toward African Americans. In fact, Mr. Roberts testified that he never personally witnessed Mr. Weber make a derogatory comment about African Americans or any other race or national origin.

Mr. Roberts' final claim is that Mr. Weber promoted a white supervisor, Kenny Foley, to a position for which an African American supervisor, L.C. Buckley, was allegedly better qualified. Although this evidence is not hearsay, it is not sufficient to deny summary judgment under the direct evidence framework. Mr. Weber was not involved in the allegedly discriminatory decision to promote Kenny Foley and was only involved in the incident to the extent that he promoted L.C. Buckley, the African American supervisor, when the position came open. This evidence fails to show that Mr. Weber displayed discriminatory animus toward African Americans. On the contrary, it indicates to the Court that Mr. Weber looked favorably on promoting an African American employee to a management position.

### b. Co-Workers

█ Mr. Roberts also alleges other Swift employees made discriminatory comments. First, Mr. Roberts claims that in April or May 1998, while Jenny Mora was a production supervisor on the ham line with Mr. Roberts, she made a discriminatory comment to him about African Americans liking "watermelon and chicken." Second, Mr. Roberts claims that another African American employee told Mr. Roberts that Jenny Mora called him a "fucking nigger."

Mr. Roberts' claim that Ms. Mora made a comment to him about "watermelon and chicken" is analyzed under Chief Judge Bennett's three-part direct evidence test, but fails to overcome the first prong. In

order for Ms. Mora's comment to rise to the level of direct evidence, she must have been a "decisionmaker" in the determination to terminate Mr. Roberts. Although this Court recognizes that "important personnel decisions often represent the collective judgment of several individuals," *Holmes*, 831 F.Supp. at 708, Mr. Roberts provides no evidence that Ms. Mora was in any way connected to the decision to terminate him.

Mr. Roberts makes two arguments to establish a link between Ms. Mora and the adverse employment decision. First, Mr. Roberts argues that Mr. Weber relied on the input of general foremen in his decision to terminate him in July 1998 and notes that Ms. Mora was a general foreman; however, Ms. Mora did not become a general foreman until 1999. Second, Mr. Roberts argues that Ms. Mora was "close" to Mitch Fricke, a general foreman at the time of Mr. Roberts' termination and Mr. Roberts' immediate supervisor, suggesting that Mr. Fricke would adopt and carry such sentiment to upper management. Given the lack of evidence that Ms. Mora and Mr. Fricke shared anything more than a common supervisor-worker relationship, the Court cannot accept such a speculative interpretation of the facts.

The Eighth Circuit "has carefully distinguished between 'comments which demonstrate a discriminatory animus in the decisional process or those uttered by individuals closely involved in employment decisions,' from 'stray remarks in the workplace....'" *Rivers–Frison*, 133 F.3d at 619 (holding that racially discriminatory comments by fellow employees in the presence of a decisionmaker is not direct evidence of discriminatory animus). Ms. Mora's comments were not made in relation to Mr. Roberts' adverse employment decision, nor was she "closely involved" in the employment decision. Therefore, Ms.

Mora's statement regarding "watermelon and chicken" is no more than a stray remark in the workplace by a nondecisionmaker.

■ Mr. Roberts' second claim that he was told by another African American employee that Ms. Mora called the employee a "fucking nigger" also fails to establish direct evidence under the *Price Waterhouse* analysis. Mr. Roberts second-hand account of Ms. Mora's alleged statement is hearsay and, as noted above, cannot alone defeat summary judgment. Even if the Court assumes, *arguendo*, that Ms. Mora's alleged statement was not hearsay evidence, it fails to rise to the level of direct evidence because Ms. Mora was not involved in the decisionmaking process.

■ Finally, Mr. Roberts cites to two instances where he overheard other employees making racially derogatory comments about African Americans. These statements were not made by persons involved in the decisionmaking process and they have no link to the adverse employment decision. Therefore, these statements are nothing more than stray remarks by nondecisionmakers.

## 2. ALLEGED DIRECT EVIDENCE OF ANIMUS AGAINST PERSONS OF MEXICAN DESCENT

■ Mr. Roberts testified that on more than a dozen occasions between June 1997 and July 1998 he witnessed Mitch Fricke, Mr. Chavarria's immediate supervisor, refer to Mexicans as "wetbacks," "sorry or lazy" and "over here just to be given things." To determine whether this evidence is sufficient under the *Price Waterhouse*, the Court must first determine whether Mr. Fricke was a decisionmaker. This determination only requires that the adverse employment decision "involved" Mr. Fricke; he need not have made the final decision. Mr. Weber testified that during the decisionmaking process he was

"informed" by others about how well a particular supervisor worked with others. Mr. Weber also stated that performance reviews were conducted by the plaintiffs' immediate supervisor. There is a genuine issue of material fact whether Mr. Fricke was involved in the decisionmaking process; therefore, viewing the facts in a light most favorable to Mr. Chavarria, the Court must assume that Mr. Fricke was sufficiently involved with the decision to view him as the decisionmaker.

■ Next, the Court turns to the content of the alleged discriminatory comments. To constitute direct evidence under the *Price Waterhouse* analysis, evidence must be "sufficient for a fact finder to find that a discriminatory attitude was more likely than not a motivating factor in the employer's decision." *Gagnon*, 284 F.3d 839, 848. The disparaging derogatory epithets attributed to Mr. Fricke clearly depict a discriminatory attitude toward Mexicans. *LaRocca v. Precision Motorcars, Inc.*, 45 F.Supp.2d 762, 770 (D.Neb.1999) (holding that co-workers' repetitive reference to employee as "wetback" or "spic" was "discriminatory conduct sufficiently severe or pervasive ... to create a hostile work environment"). These alleged comments are directly related to Mr. Chavarria's abilities as an employee and are far from "innocuous" statements unrelated to Mr. Chavarria's employment. For this reason, these alleged statements by Mr. Fricke are direct evidence of discriminatory animus by a person involved in the decision to terminate Mr. Chavarria.

■ The Court need not reach the final inquiry in the direct evidence test. The inquiry whether there was a causal link between the alleged discriminatory comments need only be made where comments are not "close in time" to the employment decision. *Simmons*, 174 F.3d at

916. According to Mr. Roberts, Mr. Fricke made derogatory comments frequently for several months immediately preceding Mr. Chavarria's termination. A causal link can be assumed because of Mr. Fricke's ability to evaluate Mr. Chavarria's performance, his animus directly related to the abilities of Mexican employees, and the fact that he was in a position to report to Mr. Weber on the performance of his underling, Mr. Chavarria.

## B. CIRCUMSTANTIAL EVIDENCE FRAMEWORK

The Eighth Circuit has recognized that because "discrimination is difficult to prove by direct evidence, employment discrimination cases require a 'simplified proof from a claimant in order to create an inference of discrimination and thereby establish a prima facie case.'" *Johnson v. Minnesota Historical Soc.*, 931 F.2d 1239, 1244 (8th Cir.1991). If a plaintiff is unable to establish direct evidence under the *Price Waterhouse* framework, employment discrimination can be established using the framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Under the McDonnell Douglas analysis, a plaintiff must first make out a prima facie case of discrimination. *Bogren v. Minnesota*, 236 F.3d 399, 404 (8th Cir. 2000) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)); *O'Sullivan v. Minnesota*, 191 F.3d 965, 969 (8th Cir.1999) (same). This showing creates a presumption of discrimination and shifts the burden of production to the defendant to articulate a legitimate, nondiscriminatory reason for firing the plaintiff. *Id.* If the defendant articulates such a reason, the presumption of discrimination drops from the case and the burden of production shifts back to the plaintiff to show that defendant's reason was not the true reason for why it did what it did, but rather a pretext for discrimination. *Id.* " 'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Bogren*, 236 F.3d at 404 (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

█ Ordinarily, a plaintiff alleging race or national origin discrimination must prove the following elements in order to make out a prima facie case of discrimination: (1) that he belonged to a protected class, (2) that he was qualified for the job he was performing, (3) that he was terminated, and (4) that his employer replaced him with a person who was not a member of the protected group. *Williams v. Ford Motor Co.*, 14 F.3d 1305, 1308 (8th Cir. 1994); *Falczynski v. Amoco Oil Co.*, 533 N.W.2d 226, 230 n. 2 (Iowa 1995). On the other hand, if the defendant demonstrates that the plaintiff was discharged due to a bona-fide reduction-in-force ("RIF"), then the standard for establishing a prima facie case of discrimination rises. The Eighth Circuit has held that "some additional showing should be necessary to make prima facie case in a reduction-in-force situation." *Holley v. Sanyo*, 771 F.2d 1161, 1165 (8th Cir.1985). The *Holley* Court suggested that:

> This further showing could take many forms. Direct evidence, as we observed, simply makes unnecessary the burden-shifting analysis. Such showing could be made, however, by statistical evidence (as, for example, where a pattern of forced early retirement or failure to promote older employees can be shown) or circumstantial evidence (such as a demonstration of a preference for younger employees in the business organization).

*Id.* at 1166. *Holley* dealt with reductions in force and the *McDonnell Douglas* test specifically in the context of age discrimination; however, the Eighth Circuit extended that analysis to other Title VII cases in *Herrero v. St. Louis University Hospital,* 109 F.3d 481, 483–84 (8th Cir. 1997).

The Eighth Circuit has also provided some direction on the degree to which a bona-fide RIF affects the third step in the *McDonnell Douglas* test, which is the Plaintiff's burden of proof that an employer's legitimate, nondiscriminatory reason for termination was pretextual and motivated by discriminatory animus.

> In a reduction-in-force case, two additional rules apply. The [law] does not authorize a court to judge the wisdom of a company's business decision to reduce its workforce in response to economic pressures. However, even within the context of a legitimate reduction-in-force, an employer may not fire an employee because of his [protected status].

*Yates v. Rexton, Inc.,* 267 F.3d 793, 800 (8th Cir.2001) (internal cite omitted). On the other hand, the Eighth Circuit does not state that a plaintiff's burden to prove pretext or discriminatory animus is somehow rebutted or raised by virtue of a bona-fide RIF.

Other circuits have split on the question of whether a bona-fide RIF changes the plaintiff's burden to prove that the proffered legitimate, nondiscriminatory reason for discharge was pretext for discriminatory animus. For example, the Sixth Circuit has held that "[a] ... plaintiff who has been terminated amidst a corporate reorganization carries a greater burden of supporting charges of discrimination than an employee who was not terminated for similar reasons." *Ridenour v. Lawson Co.,* 791 F.2d 52, 57 (6th Cir.1986); see also *Simpson v. Midland–Ross Corp.,* 823 F.2d 937, 941 (6th Cir.1987). On the other

hand, the Seventh Circuit, after first adopting the Sixth Circuit approach, explicitly rejected it. *Robinson v. PPG Indus., Inc.,* 23 F.3d 1159, 1163 (7th Cir. 1994); see also *Oxman v. WLS–TV,* 12 F.3d 652, 657 (7th Cir.1993).

In *Beaird v. Seagate Technology, Inc.,* 145 F.3d 1159, 1168 (10th Cir.1998), the Tenth Circuit adopts a useful guideline for a plaintiff to establish pretext in a case where there is a RIF by listing the possible categories of acceptable evidence:

> First, [a plaintiff] can argue that her own termination does not accord with the RIF criteria supposedly employed.... Second, a plaintiff can adduce evidence that her evaluation under the defendant's RIF criteria was deliberately falsified or manipulated so as to effect her termination or otherwise adversely alter her employment status.... Third, a plaintiff can adduce evidence that the RIF is more generally pretextual. For instance, a plaintiff may establish that an employer actively sought to replace a number of RIF-terminated employees with new hires.... Statistical evidence may, in certain circumstances, be relevant to this purpose.

The Eighth Circuit has provided some guidance of its own in various cases, although it has not delineated them in one place as the Tenth Circuit has above. The Eighth Circuit has held that where a bona-fide RIF serves as an employer's legitimate, nondiscriminatory reason for dismissal, a demonstration of competence does not serve as evidence of pretext. *Hutson v. McDonnell Douglas Corp.,* 63 F.3d 771, 779–780 (8th Cir.1995). The Eighth Circuit has also held that the absence of objective criteria used in the RIF is not evidence of discriminatory animus. *Bashara v. Black Hills Corp.,* 26 F.3d 820, 825 (8th Cir.1994).

On the other hand, the Eighth Circuit has noted that a RIF that does not use objective criteria can open the door to the argument that the RIF is pretextual. In *Gaworski v. ITT Commercial Fin. Corp.,* 17 F.3d 1104 (8th Cir.1994), the Eighth Circuit held that where no objective criteria is used for a RIF, and no objective evidence of a business decline is found, "reasonable minds could conclude that [the plaintiff] had, in fact, been replaced and that [the defendant's] purported RIF was a pretextual explanation for [the plaintiff's] discharge." *Gaworski,* 17 F.3d at 1110. Inversely, the Seventh Circuit has stated that "[i]f the Court is satisfied that the selection process was [neutral] in content and application, then an individual plaintiff will find it more difficult to present enough evidence to create a genuine issue of material fact about the motivation behind his or her individual selection for termination." *Adreani v. First Colonial Bankshares Corp.,* 154 F.3d 389, 395 (7th Cir.1998) (quoting *Allard v. Indiana Bell Tel. Co.* 1 F.Supp.2d 898, 921 (S.D.Ind.1998)).

### 1. WHETHER THERE WAS A LEGITIMATE REDUCTION IN FORCE

 Mr. Roberts argues that his prima facie case of employment discrimination need not include the "additional showing" articulated in *Holley,* 771 F.2d at 1165, because Swift did not terminate him in a *legitimate* RIF. Mr. Roberts' arguments that the RIF was not legitimate are threefold. First, Mr. Roberts claims that Swift did not utilize objective criteria to determine which jobs to eliminate. Second, he argues that Swift replaced him within six months of termination. Third, Mr Roberts claims that Swift was not suffering financial distress at the time of the termination.

Approximately one month prior to Mr. Roberts' termination, Mr. Weber became aware that Swift needed to reduce costs at the Marshalltown plant. In the process of determining where expenses could be cut, Mr. Weber considered a wide base of potential expenditures, department by department, including employment levels, telephone expenses, and vehicle expenses. As one cost reduction mechanism, Mr. Weber decided to reduce nine positions in overstaffed areas. Mr. Weber's decision as to which employees would be terminated was predicated on the number of management personnel on each production line, the performance and profitability of each line, and each management person's ability to work well with others.

First, Mr. Roberts argues that the RIF was not legitimate because it lacked objective criteria. This position is not supported by the facts or the case law. The Eighth Circuit has recognized that a RIF is typically marked by the use of objective criteria regarding which employees would be terminated. *Hillebrand v. M–Tron Indus., Inc.,* 827 F.2d 363, 367 (8th Cir.1987). Swift used objective criteria such as overstaffing and productivity to identify employees to be terminated. Even if Swift had not used such criteria, the Eighth Circuit has opined that the absence of objective criteria is not "probative evidence of discriminatory animus." *Bashara,* 26 F.3d at 825. In addition, Mr. Roberts has failed to show that Swift's use of subjective criteria based on each employees' ability to work well with others was a front for discrimination. Mr. Roberts has not provided admissible evidence giving rise to a genuine issue of fact that Mr. Weber or Mr. Fricke displayed racial animus toward African Americans that was causally related to Mr. Roberts' termination.

 Second, Mr. Roberts argues that his termination did not arise out of a legitimate RIF because Swift replaced him within six months of his termination. This argument ignores the need for businesses

to operate efficiently within an economic environment characterized by ebb and flow. It also ignores the need for business people to be free to make good faith decisions without fear that courts will impose punishment based upon 20/20 hindsight. In RIF cases, courts are "not authorize[d] ... to judge the wisdom of a company's business decision to reduce its workforce in response to economic pressures." *Yates,* 267 F.3d at 800. "A company's exercise of its business judgment 'is not a proper subject for judicial oversight.'" *Regel v. K–Mart Corp.,* 190 F.3d 876, 880 (8th Cir.1999) (quoting *Bashara,* 26 F.3d at 825). "[T]he employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgment made by employers, except to the extent that those judgments involve intentional discrimination." *Herrero,* 109 F.3d at 485 (quoting *Hutson,* 63 F.3d at 781).

Finally, Mr. Roberts argues that the RIF was not legitimate because Swift's production levels were steady or rising at the time he was terminated. Swift's stated reason for the RIF was the need to reduce expenses and improve efficiency at the Marshalltown plant. Although production may have been increasing at the time of Mr. Roberts' termination, this fails to negate Swift's need to reduce inefficiency by cutting positions in overstaffed departments. The Eighth Circuit has held that a company "need not provide evidence of financial distress to make it a 'legitimate' RIF." *Hardin v. Hussmann Corp.,* 45 F.3d 262, 265 (8th Cir.1995).

### 2. MR. ROBERTS' PRIMA FACIE CASE

■ The parties do not dispute that Mr. Roberts can meet the first three elements of a prima facie case of discrimination under *McDonnell Douglas.* Mr. Roberts is an African American, he has worked in the meat packing industry for almost ten years and has held supervisory positions for at least three years before he was terminated in 1998. The parties do dispute whether Mr. Roberts makes the "additional showing" that his termination was motivated by discriminatory animus.

■ The "additional showing" inquiry "is not a significant hurdle for an employment discrimination plaintiff." *Yates,* 267 F.3d at 799. "The only question is whether the circumstances are such that, in the absence of an explanation from the defendant, a fact finder may reasonably infer intentional discrimination." *Hutson,* 63 F.3d at 778–779. In this case, admissible evidence of racial animus toward African Americans by a decisionmaker is limited to Jenny Mora's promotion in 1999 after she allegedly made two racially derogatory remarks toward African Americans and Mr. Roberts' assertions that he was treated differently than his white counterparts. Mr. Roberts testified that he was required to work more Saturdays than his white counterparts, was denied shift changes that less qualified white employees received, and was threatened more often with the loss of his job than other white employees. These allegations are not supported by any other evidence. "To survive summary judgement, Plaintiffs must do more than make bald assertions...." *Frison v. Zebro,* 2002 WL 539069 *1, *5 (D.Minn.2002). *See also Hill v. St. Louis University,* 123 F.3d 1114, 1119 (8th Cir. 1997) (stating "unsupported allegations not competent to defeat summary judgment"); *Jiles v. Magna Lomason, Inc.,* 1998 WL 315077 *1, *1 (E.D.Ark.1998) (same).

On the other hand, the incidents involving Ms. Mora were known to management at the time of her promotion. Making all inferences in favor of Mr. Roberts, the Court must assume that Swift's management did not find these alleged incidents to

be severe enough to deny Ms. Mora the promotion. "The 'additional showing' inquiry is merely part of the establishment of the prima facie case, the purpose of which is to shift the burden of production to the defendant to provide an explanation for its apparently discriminatory behavior." *Hutson*, 63 F.3d at 778–779. This evidence is sufficient for Mr. Roberts to establish a prima facie case. Management's tolerance of Ms. Mora's alleged behavior is sufficient to merit an explanation of why Mr. Roberts' dismissal was not motivated by discriminatory animus.

Once Mr. Roberts has established a prima facie case, "[i]t then falls to the employer to promulgate a non-discriminatory, legitimate justification for its conduct.... The burden then shifts back to the employee who must either introduce evidence to rebut the employer's justification as a pretext for discrimination, or introduce additional evidence proving actual discrimination." *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1111 (8th Cir.2001). Although the evidence proffered by Mr. Roberts overcomes the hurdle of showing a prima facie case, it is not sufficient to establish pretext.

> At the pretext stage ... the question is much more focused: Has the plaintiff shown that the explanation extracted from the defendant by virtue of the *prima facie* case is a pretext for discrimination? There is no reason to believe, *a priori*, that the contours of such an inquiry, which is intimately related to the ultimate issue to be determined, i.e., intentional discrimination, is identical to the initial, but important, task of forcing the employer to explain its actions.

*Id.* Swift's explanation for terminating Mr. Roberts was based upon his history of confrontations with superiors and other employees and various production problems. Evidence of Mr. Roberts' poor performance substantially supports Swift's decision to select him for termination over other employees. Mr. Roberts was involved on a number of occasions in confrontations with his superiors and other employees. While acting as a supervisor, he was documented for calling an hourly employee a "fat fuck" when she asked him to move out of her way. On another occasion, Mr. Roberts also said to a superior, "Hey man, I didn't ask you to get smart with me." Although Mr. Roberts contends that these confrontations occurred because he was standing up for himself against persons with racially discriminatory attitudes, he provides no evidence that the persons involved-Monica Halverson and Dave Feeback-ever displayed racial animus. Also, on a number of occasions, Mr. Roberts failed to follow production protocol and had production problems on the line he supervised, including a single day where his line suffered a loss of $10,000.

Mr. Roberts has failed to produce any evidence that Swift's reason for termination-a RIF with criteria directly related to employee performance-was pretextual. As stated in the direct evidence analysis, there is no admissible evidence that a decisionmaker, i.e. Mr. Weber or Mr. Fricke, displayed any racial animus toward African Americans and there is no evidence that other employees were involved in the employment decisionmaking process.

## IV. ORDER

The defendant's motion for summary judgment is denied in part and granted in part. Summary judgment with regard to Plaintiff Miguel Chavarria is denied. Summary judgment with regard to Plaintiff Roberts is granted.

IT IS SO ORDERED.